# In the United States Court of Federal Claims

**No. 10-878C**
**Bid Protest**
**(Filed:  April 30, 2014)[1]**
**(Reissued:  May 30, 2014)**

```
* * * * * * * * * * * * * * * * * * * * * * *   *
                                                *
COMMUNICATION CONSTRUCTION                      *
SERVICES, INC.,                                 *
                                                *
                    Plaintiff,                  *
                                                *
v.                                              *
                                                *
THE UNITED STATES,                              *
                                                *
                    Defendant,                  *
                                                *
     and                                        *
                                                *
RESOLUTE PARTNERS, LLC,                         *
                                                *
                    Intervenor.                 *
                                                *
* * * * * * * * * * * * * * * * * * * * * * *   *
```

**Post-award Bid Protest; 28 U.S.C. § 1491(a)(1) Jurisdiction; Nonappropriated Fund Instrumentality ("NAFI"); Army and Air Force Exchange Service Procurement; <u>Blue & Gold</u> Waiver; Supplementation of Administrative Record; Breach of Implied Duty of Fair Dealing; 10 U.S.C. § 2492a; Organizational Conflict of Interest; Responsibility Determination; Technical Evaluation; Fee Evaluation; Appearance of Impropriety; Indebtedness of Awardee.**

<u>Richard P. Rector</u>, DLA Piper, LLP (US), 500 Eighth Street, NW, Washington, D.C. 20004, for Plaintiff.  <u>Seamus Curley</u>, <u>Samuel B. Knowles</u>, <u>Dionis M. Gauvin</u>, and <u>Nedra S. Adams</u>, DLA Piper, LLP (US), 500 Eighth Street, NW, Washington, D.C. 20004, of Counsel.

<u>Stuart F. Delery</u>, <u>Jeanne E. Davidson</u>, <u>Steven J. Gillingham</u>, and <u>Alexis J. Echols</u>, United States Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Post Office, Washington, D.C. 20044, for Defendant.

<u>Joseph P. Hornyak</u>, Holland and Knight LLP, 1600 Tysons Boulevard, Suite 700, McLean, VA 22102, for Intervenor.  <u>Megan M. Jeschke</u> and <u>Jacob W. Scott</u>, Holland and Knight LLP, 1600 Tysons Boulevard, Suite 700, McLean, VA 22102, of Counsel.

---

[1] The Court issued this opinion under seal on April 30, 2014, and directed the parties to file proposed redactions by May 14, 2014.  The Court publishes this opinion adopting the proposed redactions.  Redactions are indicated by brackets "**[ * * * ]**."

---

**OPINION AND ORDER GRANTING DEFENDANT'S AND INTERVENOR'S
MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

---

<u>WILLIAMS</u>, Judge

Plaintiff, Communication Construction Services, Inc. ("CCS") challenges the Army and Air Force Exchange Service's ("AAFES") award of a contract for internet and telecommunications services to Resolute Partners, LLC ("Resolute").   AAFES, a nonappropriated fund instrumentality of the United States Government ("NAFI"), provides merchandise and services to active duty and reserve military members and their families. AAFES' earnings support the Army's Family Morale Welfare and Recreation Command ("FMWRC") programs.   CCS brings this bid protest invoking this Court's general contract jurisdiction, 28 U.S.C. § 1491(a), claiming that Defendant breached its implied duty to fairly consider CCS' proposal.   This matter comes before this Court on CCS' motion for summary judgment and Defendant's and Intervenor's motions for judgment on the Administrative Record ("AR").   CCS seeks its proposal preparation costs and an order remanding the procurement to AAFES.

CCS presents five grounds of protest.   First, CCS claims that the Army Recreation Machine Program ("ARMP"), a subsidiary of FMWRC, acted as subcontractor to the awardee, Resolute, in violation of 10 U.S.C. § 2492a.   This statute prohibits Department of Defense ("DoD") entities from offering or providing telecommunications services to consumers for a fee and from competing for contracts to provide such services.   Second, CCS claims that FMWRC's role in the procurement created an organizational conflict of interest ("OCI") because FMWRC shaped the solicitation and participated in the source selection process, and because FMWRC's subsidiary, ARMP, competed in the procurement as a subcontractor to the awardee.   Third, CCS argues that the technical and price evaluations conducted by AAFES were unreasonable and contrary to the terms of the solicitation.   Fourth, CCS contends that AAFES improperly determined that Resolute was a responsible contractor.   Lastly, CCS claims that an appearance of impropriety tainted the competition because Resolute was indebted to AAFES and AAFES considered this debt in making the award decision.

The Court denies the protest.   CCS waived its statutory violation and OCI claims because it knew the grounds for those claims prior to award but failed to timely raise them.   The evaluation of proposals and responsibility determination were reasonable, and CCS failed to demonstrate that either an OCI or an appearance of impropriety tainted the competitive process.

**Findings of Fact**[2]

**Information Services Provided on Air Force and Army Installations**

There are two kinds of information services provided on Air Force and Army installations, Personal Information Services and FMWRC Information Services. See AR 4, 119, 366. Personal Information Services include "for-fee" internet, telephone, and television services paid for by civilian or military personnel for personal use -- for "unofficial services" -- in barracks, housing, and internet cafes. AR 334, 362, 427-28, 1776. Prior to December 2009, both AAFES and FMWRC provided "for-fee" internet services on Army and Air Force installations. AR 119, 366. AAFES provided the services through contracts with internet service providers ("ISP"), while FMWRC utilized a government-owned infrastructure operated by ARMP to provide the services. AR 2, 119, 366. This protest arose after FMWRC and AAFES executed an agreement to transfer management, sale, and operation of the for-fee internet services to AAFES. AR 4-7.

The FMWRC Information Services supported "official" business functions where users do not pay a fee, and ARMP provided these free services using the FMWRC Information Services network, a telecommunications system of government-owned utilities and infrastructure -- the same infrastructure ARMP used to provide Personal Information Services. AR 1, 2, 334, 427; see AR 119, 366, 8768, 8808, 8822, 8836.

**Legislative and Regulatory Changes Regarding the Provision of Personal Information Services**

On February 23, 2009, AAFES and FMWRC entered into a Memorandum of Understanding ("MOU") to "establish a non-competitive partnership between AAFES and FMWRC to provide common levels of personal information services based on best business practices and cost benefit analysis that minimizes the cost of services to individual users." AR 9158; see AR 9158-62. The MOU stated that the partnership would be "executed" in accordance with implementing instructions that would "describe the detailed responsibilities" of each partner. AR 9159.

On May 11, 2009, Army, AAFES, and DoD officials met with the House Armed Services Committee ("House Committee") concerning the proposed plan to transfer all Personal Information Services operations and related contracts to AAFES. See AR 10537. In a letter dated May 22, 2009, the House Committee approved this plan and provided the following direction:

> The Committee views military resale and nonappropriated fund business activities as government entities that must not compete directly with private sector

---

[2] These findings are derived from the AR as supplemented. As explained below, the Court issues findings of fact because it resolves the protest on motions for judgment on the AR, not motions for summary judgment. Findings of fact related to the evaluation and the alleged organization conflict of interest are included in the discussion.

3

enterprises capable of providing the desired services. In this regard, the Committee directs that within the Department of Defense, no DoD entity may either provide personal information services using DoD resources, personnel or equipment, or compete for contracts to provide such services when the intent is to charge users to recover cost or to earn profits. This prohibition does not prevent or preclude the use of DoD personnel, resources or equipment to administer and oversee personal information services contracts, nor does it preclude [AAFES] from carrying out the plan to provide personal information services through contractors as approved by the Committee.

AR 10531.

The final version of the National Defense Authorization Act for Fiscal Year 2010 incorporated the House Committee's directive. See Pub. L. 111-84, § 651, 123 Stat. 2368. Now codified at 10 U.S.C. § 2492a, this legislation became effective on October 28, 2009, and provides:

(a) Limitation.—(1) Notwithstanding section 2492 of this title, the Secretary of Defense may not authorize a Department of Defense entity to offer or provide personal information services directly to users using Department resources, personnel, or equipment, or compete for contracts to provide such personal information services directly to users, if users will be charged a fee for the personal information services to recover the cost incurred to provide the services or to earn a profit.

(2) The limitation in paragraph (1) shall not be construed to prohibit or preclude the use of Department resources, personnel, or equipment to administer or facilitate personal information services contracts with private contractors.

* * *

(c) Personal Information Services Defined.—In this section, the term "personal information services" means the provision of Internet, telephone, or television services to consumers.

10 U.S.C. § 2492a (Supp. III 2009).

On December 24, 2009, FMWRC and AAFES finalized a Memorandum of Agreement ("MOA") implementing the requirements of § 2492a. AR 4-7. The December MOA provided:

AAFES will be responsible for provisioning for-fee Internet services on Military Installations through a commercial Internet Service Provider (ISP).

FMWRC will transfer for-fee internet service programs currently operated by ARMP to AAFES on a mutually agreed upon schedule that minimizes disruption to the customer. All transfers must be completed by 31 December 2010.

* * *

> To the extent that AAFES' commercial ISP[s] can provide their own infrastructure to maintain connectivity at existing locations they may do so. Otherwise, AAFES' ISP[s] will have the option of using ARMP provided resources.

* * *

> The level of ARMP Internet Services provided to the AAFES ISP will meet or exceed current service levels.

> [FMWRC will] [o]ffer to sell or lease existing Internet assets dedicated to Personal Information Services . . . directly to AAFES' ISPs at a negotiated value where AAFES' ISPs intend to use existing assets and/or infrastructure to deliver the Internet services to a location.

AR 5-6.   To implement this "transfer of function," AAFES was to "competitively award and/or modify existing contracts for for-fee Internet services transferred from FMWRC to AAFES." AR 6.  The December MOA further stated:  "There will be no transfer of Internet assets from FMWRC to AAFES as a component of this agreement.  FMWRC through [its] ARMP program will offer Internet network services as an option to AAFES' ISP[s] for a fee." AR 7.

**CCS' and Resolute's Bridge Contracts**

As part of the transfer of Personal Information Services from FMWRC to AAFES, ARMP awarded CCS a bridge contract on May 4, 2010, to use ARMP's network infrastructure and equipment to provide Personal Information Services for consumers at 318 building locations on military installations.  AR 1867-92.  CCS' bridge contract was set to terminate on November 30, 2011.  AR 1868, 1875.  The bridge contract provided that ARMP planned to use its network to provide bandwidth for personal information services, as it had before the bridge contract.  AR 1869-70.

On July 10, 2010, ARMP entered into a similar bridge contract with Intervenor Resolute, that covered 243 buildings.  See AR 2025-45.

**The Instructions for Personal Information Services Implementation on FMWRC's Website**

"Implementation Instructions" were issued to "provide a centralized reference document" in support of the MOU governing the AAFES/FMWRC "non-competitive partnership" to provide Personal Information Services.  AR 330-63.  This document, or a substantially similar version, was available on FMWRC's webpage as early as February 4, 2010, but it was not referenced in the solicitation or directly disseminated to offerors in the procurement process.  See id.; Def.'s Notice of Compliance ¶¶ 1-2, Nov. 21, 2011; Evard Decl. ("Third Evard Decl.") ¶ 5(1), Nov. 18, 2011 (Ex. A to Plaintiff's Resp. to Nov. 15, 2011 Order); Guertin Decl. ¶ 4,

Nov. 21, 2011 (Ex. A to Intervenor's Resp. to Nov. 15, 2011 Order).  Nonetheless, Defendant included these Instructions, some 34 pages, in the AR.  AR 330-63.

The purpose of the Implementing Instructions was to outline the procedures to successfully deploy the AAFES/FMWRC partnership and identify the role, oversight, and management responsibilities of AAFES to deliver Personal Information Services to service members.  AR 331.  Under a heading titled "Staff Planning," the Implementing Instructions stated, "FMWRC will appoint a FMWRC Telecommunications Operations Manager as the primary FMWRC Coordinator of the [Personal Information Services] partnership . . . ." AR 337.  The Instructions also stated, "FMWRC will assign one . . . Contracting Officer and one . . . Business Manager, under operational control of the [AAFES Vice President] . . . ." Id.  The Implementing Instructions further specified that the business manager would be a voting member of the Source Selection Committee panels, participate in the development of new business requirements, and have a role in developing contracting methodology.  AR 351-52.

The Implementing Instructions also defined the role of the contracting officer, who was to develop and assist with Personal Information Services contract implementation and execution, and lead in the development and fulfillment of acquisition plans, contract requirements, solicitation development, contract negotiations, and award.  AR 353-54.

## The Request for Information

On February 11, 2010, AAFES issued a Request for Information ("RFI") to prospective contractors to provide for-fee consumer telecommunication services at various military installations.  AR 8.  The RFI notified vendors that "ARMP [would be] able to provide AAFES selected suppliers" network support, but that "[a]ny agreements with ARMP [would] be independent of contracts with AAFES."  AR 29.  The RFI stated that after a solicitation was issued, ARMP would host an industry information day where attendees would gain an understanding of "ARMP provided services" and participate in an open forum to exchange information.  Id.

## The Draft Solicitation

On April 12, 2010, AAFES issued a draft solicitation for the for-fee ISP procurement.  AR 118.  The draft solicitation offered ARMP as a "'turnkey network' and maintenance provider for those locations where ARMP [had] installed infrastructure" and stated that "[i]f providers choose to use ARMP, then ARMP shall assume the role of a sub-contractor to the prospective ISP."  AR 119-20.  The draft solicitation listed advantages of using the ARMP network solution that were substantially reiterated in the final solicitation.  AR 120-21, 367.  The draft solicitation also announced Industry Day, characterizing it as a "Site Survey" and an important event for prospective offerors.  AR 118; see AR 126.

## Industry Day

On April 28, 2010, AAFES and ARMP held Industry Day at Fort Carson, Colorado.  AR 277.  Representatives from CCS including Mr. Tim Evard, CCS' Executive Vice President,

attended Industry Day.  AR 328-29, 2108.  The Industry Day presentation, also referred to as a pre-proposal conference, included an introduction to the "Key Procurement/Operations Team," and an overview of ARMP's services.  AR 275-76, 279, 281-82; see AR 290.  The record contains the 68 slides used in the Industry Day presentation.  AR 256-323.

As part of the Industry Day presentation, AAFES' Chief for New Business and another AAFES employee showed attendees a slide identifying the "Key Procurement/Operations Team" as Cynthia Williams (Contracting Officer, AAFES), Nathanial Wills (Army Contracting Specialist, FMWRC), Mike Kaucher (Chief for New Business, AAFES,) John Temple (Army Business Manager, FMWRC), David LaPradd (Telecommunications Operations Manager, FMWRC), and William Hart (General Manager, ARMP).  AR 126, 279.

Industry Day attendees were informed that ARMP was an "operational element of [FMWRC]" that was "[c]reated to develop revenue to fund Morale, Welfare & Recreation programs Army wide."  AR 274.  A slide listing frequently asked questions stated that bidders could partner with ARMP, and that ARMP would provide "installation site review coordination and service deployment."  AR 321.  Another slide informed offerors that ARMP could provide a variety of services:  "Internet Gateway & LAN Services; Internet Access Device leasing, management, and support; Service Leasing; Hardware Support; Security Services and Support; Systems Maintenance, Troubleshooting, and Support; Onsite Technical Service; Recreational Machine leasing, and Support; [and] Remote Technical Support."  AR 275.  An additional slide indicated that ARMP "operated" in the Continental United States at "[m]ost major garrisons" with "[p]lans to reach all garrisons in coming years."  AR 276.

A slide titled "Key Telecommunications Agreements/Policies" identified the February 2009 Memorandum of Understanding, the December 2009 Memorandum of Agreement and an April 2010 Army policy letter that provided guidance regarding the transition of the Army's for-fee Personal Information Services to AAFES.  AR 282; see AR 362-63.  These three documents were available on FMWRC's website.  Def.'s Notice of Compliance ¶ 2.  The Industry Day slide presentation did not reference the Implementing Instructions.  See AR 256-323.[3]

**The Solicitation**

On May 12, 2010, AAFES issued solicitation number RFP ATI-09-010-10-014.  AR 364-463.[4]  The purpose of the solicitation was to obtain "pre-paid," "for-fee" internet services, with an option for voice, video, and "post-paid" internet, at 79 Army and Air Force installations in five geographic locations in the United States.  AR 376, 410-417.  The solicitation contemplated a five-year base period, with five one-year option periods.  AR 376.  Provision of services at other military bases within a geographic group was optional.  Id.  The solicitation further notified

---

[3] On April 30, 2010, the contracting officer emailed Industry Day attendees a copy of the "presentations briefed at Industry Day."  AR 10468-69.

[4] The solicitation was largely the same as the draft solicitation issued the prior month. Compare AR 119-231 with AR 366-463.

offerors that service requirements could be expanded to military bases not listed in the solicitation.  AR 376, 378.

The solicitation expressly addressed ARMP's role as a potential subcontractor.  The Executive Summary stated:

e.  ARMP as a Potential Internet Sub-Contractor

1) ARMP has offered a "turnkey" network and maintenance provider agreement for those Installations where ARMP infrastructure exists or is planned.  At those Installations, commercial ISPs will have an option of leasing the ARMP network and equipment at a negotiated price, or [of providing] the necessary network and equipment separately.  If providers choose to utilize the ARMP network, then ARMP shall assume the role of sub-contractor to the prospective ISP.  The ISP's agreement with ARMP will be a separate contract from the contract with AAFES.

AR 366-67 (emphasis omitted).  Under the same paragraph, the solicitation listed "[s]ome advantages of using the ARMP network and equipment:"

i.  The existing bandwidth, infrastructure and network components are already in place which may prevent any break in current service and will facilitate faster speed to market.

ii.  Turnkey operation for the new provider.

iii.  Maintenance, support, and installation of new equipment and upgrades as necessary . . . .

iv.  Ability to continue to support customers without a break in service during the transition period from ARMP to the competitively selected AAFES ISP.

v.  Efficiency and economy which ARMP currently utilizes with [its] installed infrastructure to support FMWRC mission related services.

* * *

vi.  ARMP has the capability to coordinate between the Installation Management Command (INCOM) proponent activities on Army Garrisons and the AAFES ISP to ensure proper implementation and has the flexibility to adjust network configurations to accommodate growth and mission changes.

vii.  ARMP provides Internet network access to a commercial carrier and bandwidth provisioned to selected Installations through access points

installed in End User Buildings.   The result is [end-to-end] turnkey
solution for the AAFES Contractor ISP.

AR 367.

In Exhibit I, titled "Evaluation for Award Criteria," the solicitation stated that AAFES
would award one contract per geographic group to responsible offerors whose proposals were
deemed "the 'best value' for AAFES." AR 453. Each service offering, i.e., internet, voice, and
video, was a standalone service, and AAFES was not required to award anything other than
internet -- the "objective" was to employ "superior" internet service and other services were
optional. AR 453-54. Each of the three service offerings was to be rated separately under the
following 11 weighted factors:

| Factor | Relative Order Category | Weight Given |
|---|---|---|
| Products | Greatest Importance | 15% |
| Technical Design | Greatest Importance | 15% |
| Scalability | Moderate Importance | 10% |
| Standards | Moderate Importance | 10% |
| Portability | Moderate Importance | 10% |
| Speed to Market | Moderate Importance | 10% |
| Past Performance | Moderate Importance | 10% |
| Marketing | General Importance | 5% |
| Customer Account Service | General Importance | 5% |
| Customer Care & Customer Satisfaction | General Importance | 5% |
| Business Understanding & Reporting | General Importance | 5% |

AR 453-54. Evaluators were to employ these factors and justify their final numerical factor
ratings using a narrative of strengths, weaknesses, and risks. AR 454. Once a total weighted
score was established for each of the three service offerings, these scores would again be
weighted to produce the overall proposal score. AR 453. Internet service was to receive 95% of
the overall weight, video service 2%, and voice service 3%. AR 453-54.

The technical evaluation process was governed by the solicitation and AAFES' Exchange
Operating Procedure (EOP) 65-13. AR 366-463, 7920-7963. First, the Source Selection
Committee voting members were to "review and rate proposals individually." AR 7935, 7941.
The technical evaluation score sheets provided scoring guidance. See AR 8106. Individual
evaluators were encouraged to use 50 points as a baseline, and then increase or decrease the
score based on their "analysis of the vendor's response and [its] ability to fulfill the
requirement." See id. The individual score sheets also provided spaces for written comments
and suggested using comment codes to indicate whether a feature of the proposal was a
Significant Strength, Strength, Weakness, Significant Weakness, or Risk. See, e.g., AR 1248-53;
see also AR 8106.

After each voting member of the Source Selection Committee scored the proposals, the Committee would meet for discussion, with the goal of coming to a consensus on the evaluations and preparing a written report to summarize the results and rank the proposals. AR 7935, 7942-43. The report was to discuss the basis for the Source Selection Committee's ranking in sufficient detail to support the Committee's recommendation. AR 7935, 7943. Exchange Operating Procedure 65-13 provided that the Source Selection Committee report would "summarize[] the strengths, weaknesses, and risks of each proposal." AR 7935. All original individual scoring sheets were required to be attached to the report. AR 7943.

In addition to a technical evaluation, the solicitation stated that AAFES would review the offerors' fee proposals for the projected financial benefit to AAFES, and explained that "[a]s the technical rankings [became] closer, the Fees to AAFES [would] become more important." AR 453, 455. Under the solicitation, the fees for internet, voice, and video services were to be weighted as follows:

a. Initial Contract Ordering Period Fees        - will be multiplied by 2
b. Contract Option Periods 1-5 Fees             - will be multiplied by 1

AR 455. For purposes of evaluation, the voice and video services fees would not be combined with internet service fees. Id. The purpose behind these weights was "to ensure that AAFES . . . received a balanced proposal and obtained a reasonable fee proposal for 'firm' periods (years 1-5) versus the uncertain Contract Option Periods." AR 1512 (emphasis in original). Each offeror was to submit a single fee percentage for each military installation and each service being proposed within a geographic group, accounting for every installation within the geographic location being proposed. AR 458. As part of these fee proposals, offerors were required to provide pro forma Operating Statements, containing projections for internet service in each geographic group being proposed. Id.

Offerors were also required to submit past performance references. AR 456, 458. The solicitation required each offeror to "provide descriptions of three (3) to five (5) operations in use during the past five (5) years of similar type and size of the project, as described within this solicitation." AR 458.

On June 14, 2010, AAFES amended the solicitation by, inter alia, adding an internet services pro forma Operating Statement form and delineating the type of information to be included in that Statement. AR 882, 908 (Tab 12). Offerors were required to provide financial information in eight categories: investment outlays, sales, gross operating income, operating expenses, total operating expenses, operating earnings before interest and taxes, pre-tax income, and net income. AR 908 (Tab 12). The pro forma Operating Statements were to cover only the first five-year contract period, even though offerors were required to provide fee data for a 10-year period, and were to be evaluated based on a 10-year period. Id.; see AR 407. The Amendment also extended the due date for the submission of proposals until June 23, 2010. AR 882 (Tab 12).

**CCS' Pre-Proposal Communications with AAFES**

In March 2010, CCS emailed AAFES objecting to build-out activities at Fort Bliss, a location where CCS was providing services under its bridge contract, claiming ARMP's activities violated 10 U.S.C. § 2492a. AR 2515-16; see AR 279, 1887. This statute prohibited DoD entities from offering or providing Personal Information Services to consumers using DoD resources, personnel, or equipment or competing to provide Personal Information Services for a fee. CCS stated:

> [W]e are becoming increasingly concerned that ARMP has every intention of not only staying in the WIFI business, but monopolizing it per their previous effort, in what appears to be blatant disregard of [C]ongress' wishes.
>
> We had previously informed you that we would take Fort Bliss and give consideration to the ARMP "services" where [it] had deployed infrastructure. We presumed, based on our conversations, that [ARMP] would not continue to invest tax dollars in adding infrastructure since we are willing to provide the internet services[.]
>
> However, [ARMP] continue[s] to add or attempt to add to [its] network . . . despite our stated willingness and ability to provide service.

Id.

> AAFES replied:
>
> We are not privy to all of [ARMP's] plans and negotiations between you as it relates to the optional infrastructure use. However, we are aware and do understand ARMP has a command commitment to complete build-out work at Bliss--and other locations--and that you both were in discussions on how that could be accomplished at Bliss.
>
> The legislative guidance is clear on how [Personal Information] services will be provided and FMWRC has made a commitment to that.

AR 2515. In a response sent to both AAFES and FMWRC, CCS stated: "All due respect to ARMP and [its] 'commitments.' The Congress and the Law is clear. What part of this is not understandable? Congress . . . has said stop doing this and it is continuing." AR 2514; see AR 107, 279, 8150.

In May 2010, CCS submitted questions to the contracting officer regarding ARMP's planned role in the procurement. AR 2943. CCS stated:

> [ARMP's] role is a little confusing and the scope of [its] support is not clear. Will [it] only be able to provide support services where [it has] deployed [Personal Information Services] already? Will [it] be able to provide those services where [it

deploys FMWRC Information Services] going forward (over [its FMWRC Information Services] network)?  Is there any certainty around where and on what time schedule [it] will be able to provide services going forward?  If [ARMP's] business model is to receive a percentage of revenue, in exchange for providing infrastructure and capital investment, [is ARMP] in a position to deploy "risk" capital for the winning bidder(s)?

Id.  The contracting officer responded:

a)  ARMP is not limited to deploy [Personal Information Services] to provide support.  The deployment of ARMP's official service support network [FMWRC Information Services] is independent from the for fee services that AAFES will offer.

b) ARMP would need to confirm [its] capability outside the Army sphere and [FMWRC Information Systems] network.  As the [FMWRC Information Services] network expands, the capability to support providers will also expand; although, separate agreements and [service-level agreements] are required with ARMP to consider future expansion.

c) This will be handled on a case by case basis directly with ARMP and included in the [service-level agreement].  It is [AAFES'] understanding that ARMP will work collaboratively with the vendors.

d) This will be handled on a case by case basis directly negotiated with ARMP.  Under the ARMP proposal, [its] risk is the same as the vendor['s], since the reimbursement to ARMP is based upon revenue and there is a fixed cost for ARMP to install and maintain the network.

Id.

## Offerors' Knowledge of the Implementing Instructions

On February 4, 2010, Resolute's Vice President of Marketing, Paul Guertin, found the Personal Information Services Implementing Instructions "during [a] web-based search," and forwarded them to other Resolute executives.  Guertin Decl. ¶¶ 3, 4.  The Implementing Instructions focused on the newly formed partnership between AAFES and FMWRC and its effort to create an integrated strategy to manage Personal Information Services.  Id. at Ex. B (Version 3.6, Jan. 21, 2010 Implementing Instructions); see also AR 333-34 (Version 3.9, May 10, 2010 Implementing Instructions).  The annexes to the Jan. 21, 2010 Implementing Instructions Mr. Guertin located online included:  (1) the 2009 February MOU between AAFES and FMWRC on Personal Information Services, (2) an explanation of the roles and responsibilities of FMWRC-appointed telecommunications operations manager and FMWRC-assigned business manager and contracting officer, and (3) a sample statement of work for Personal Information Services.  Guertin Decl. 21-32.  The annexes to the May 10, 2010 version of the Implementing Instructions also included the 2009 December MOA between FMWRC and

AAFES and the April 6, 2010 memorandum from the Army's Assistant Chief of Staff for Installation Management to all Army bases regarding Personal Information Services.  AR 358-63.  On March 3, 2010, Mr. Guertin again accessed the Implementing Instructions and forwarded them to two Resolute executives.  Guertin Decl. ¶ 5.

Mr. Evard, Executive Vice President of CCS, testified in a declaration that CCS did not obtain the Implementing Instructions prior to June 18, 2010, and that he personally became aware of the Implementing Instructions on October 14, 2010, after proposals were submitted, "while performing research on a matter unrelated to this litigation."  Third Evard Decl. ¶¶ 5(1), (3).  Mr. Evard "did not review the document in detail, and did not review the Annexes at all, until mid-December when [CCS was] preparing the Complaint in this action."  Id.

## The Proposals

AAFES received six proposals.  AR 1501.[5]  CCS proposed to use ARMP for some of its existing infrastructure needs, stating it had "plans and the necessary partnerships, including ARMP, in place to roll services out to all locations by June 30, 2011."  AR 713 (Tab 13) (emphasis omitted).  The proposal indicated that CCS would self-deploy many of the networks and infrastructure but that ARMP would be a "deployment partner" at 18 mandatory bases.  AR 830-834 (Tab 13).  In its proposal, CCS stated it chose to limit ARMP's role because of concerns over the availability of ARMP's infrastructure.  AR 804 (Tab 13).

CCS proposed a [ * * * ] AAFES commission for internet services at four of the five geographic locations -- except for the Alaska region.  AR 843-49 (Tab 13).  According to CCS' pro forma Operating Statements, CCS projected [ * * * * * ] in combined internet sales from the Western, Hawaii, Central, and Eastern regions, giving AAFES an estimated commission of [ * * * * * * ] for the five-year period.  AR 857 (Tab 13); see AR 858-63 (Tab 13).  CCS' pro forma Operating Statements did not provide its estimated penetration rate, i.e., the estimated percentage of the base population that would pay for hourly, daily, weekly, and monthly internet service plans.  AR 857 (Tab 13); see AR 858-63 (Tab 13).

Resolute also submitted a timely proposal for all geographic regions.  See AR 464-709 (Tab 14).  Resolute divided the mandatory military bases into three groups: Group A -- locations with an existing and operational ARMP network without a service provider, Group B -- locations with an existing but nonoperational ARMP infrastructure without a service provider, and Group C -- locations with an existing provider with contracts expiring in 2011.  AR 535-42 (Tab 14).  For Group A locations, Resolute proposed partnering with ARMP to transition existing services to Resolute.  AR 535 (Tab 14).  At Group B locations, Resolute planned to partner with ARMP to make services operational on ARMP's existing infrastructure.  AR 538 (Tab 14).  For Group C locations, Resolute would partner with ARMP when available.  AR 540-42 (Tab 14).  Resolute did not expressly reference a "subcontract" with ARMP, but called its relationship with ARMP a

---

[5]  The record only contains the proposals of Resolute, CCS, and NetNearU.  AR 464-881 (Tabs 13-14), 909-1010 (Tab 15).

partnership and referred to ARMP as its "preferred vendor."  AR 466-67, 535, 538, 540, 619, 662, 664 (Tab 14).

Regarding fees, Resolute assumed an average monthly penetration rate of [ * * * * ] in 2011 on fully built-out mandatory bases, but applied a [ * ] discount to its estimated penetration rates to account for competition from existing franchises (in locations with provider contracts expiring in 2011).  AR 686-87 (Tab 14); see AR 540-42 (Tab 14).  Resolute's pro forma Operating Statements reflected [ * * * * * ] commission [ * * * * ] for AAFES, an [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ].  AR 687 (Tab 14).  Resolute projected internet sales of [ * * * * * * ] for all geographic regions [ * * * * * * * * * * ].  AR 688 (Tab 14).  This translated into commissions [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ].  AR 688-89 (Tab 14); see AR 687 (Tab 14).

## The Technical Evaluation

The Source Selection Committee was comprised of five voting individuals, and each member used individual score sheets when conducting the technical evaluations.  AR 1248-1499, 1519; see 7935, 7141.  While all voting members of the Committee provided comments justifying their scores, not all used the prescribed comment codes -- significant strength, strength, significant weakness, weakness, clarification, and risk.  AR 1248-1499.  For example, when scoring CCS for past performance, one evaluator wrote:  "10+ years in internet business, worked [with] [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ], has experience working on a military base."  AR 1271.  Individual evaluation scores were then modified based on the Source Selection Committee's consensus discussion.  AR 1248-1499.  These modifications were made either directly on score sheets, or were reflected as differences between the numerical scores listed on individual score sheets and the final Source Selection Committee Spreadsheet reflecting the consensus numbers.  See, e.g., AR 1270-73 (an evaluation team member's score sheets for CCS, noting changes in factor scores made after the discussion); AR 1328-33 (an evaluation team member's score sheets for CCS highlighting several large point increases from the original scores).

Below is a summary of the changes between the initial individual scores and the Source Selection Committee consensus scores for CCS' and Resolute's proposals for internet services:

### Individual Source Selection Committee Member Scores for CCS

| Evaluation Factor | Individual Scores Pre Consensus Meeting | | | | | Individual Scores Post Consensus Meeting | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | JT | DL | AM | MK | MV | JT | DL | AM | MK | MV |
| Products | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Portability | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Marketing | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Technical Design | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Scalability | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Standards | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Speed to Market | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Account Service | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Care and Customer Satisfaction | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Past Performance | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Business Understanding and Reporting | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

AR 1228, 1248-53, 1268-73, 1290-95, 1308-13, 1328-33.

### Individual Source Selection Committee Member Scores for Resolute

| | Individual Scores Pre Consensus Meeting | | | | | Individual Scores Post Consensus Meeting | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Evaluation Factor | JT | DL | AM | MK | MV | JT | DL | AM | MK | MV |
| Products | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Portability | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Marketing | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Technical Design | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Scalability | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Standards | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Speed to Market | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Account Service | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Care and Customer Satisfaction | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Past Performance | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Business Understanding and Reporting | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

AR 1230, 1349-54, 1369-74, 1389-94, 1407-12, 1427-32.

The individual scores were then weighted for each evaluation factor as follows:

| | CCS' Weighted Scores for Internet | | | | | | Resolute's Weighted Scores for Internet | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Evaluation Factor | JT | DL | AM | MK | MV | Avg | JT | DL | AM | MK | MV | Avg |
| Products (15%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Portability (10%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Marketing (5%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Technical Design (15%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scalability (10%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Standards (10%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Speed to Market (10%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Account Service (5%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Care and Customer Satisfaction (5%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Past Performance (10%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Business Understanding and Reporting (5%) | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| TOTAL: | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

AR 1228, 1230.

The Source Selection Committee Report ranked each offeror based on its raw score for internet services.  AR 1525 (Table 2).  Resolute ranked first in all factors except portability, a factor of moderate importance, where it ranked second.  AR 1520, 1526.  CCS ranked [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ].  AR 1521, 1526. The following chart compares the scores of Resolute and CCS for each factor:

| Evaluation Factor | Resolute Score | CCS Score |
|---|---|---|
| Products | [***] | [***] |
| Portability | [***] | [***] |
| Marketing | [***] | [***] |
| Technical Design | [***] | [***] |
| Scalability | [***] | [***] |
| Standards | [***] | [***] |
| Speed to Market | [***] | [***] |
| Customer Account Service | [***] | [***] |
| Customer Care and Customer Satisfaction | [***] | [***] |
| Past Performance | [***] | [***] |
| Business Understanding and Reporting | [***] | [***] |

AR 1526.

The Source Selection Committee also ranked the proposals in terms of total average weighted scores for internet.  AR 1525.  Resolute's total average weighted score was **[ * * ]**.  Id. CCS' total average weighted score was **[ * * * ]**.  Id.  Overall, Resolute ranked first for internet services and CCS ranked **[ * * ]**.  Id.  Regarding Resolute, the Source Selection Committee Report stated:

> With the exception of the corporate financial position, this is clearly the best proposal.
>
> . . . Resolute has strong, flexible product options with ample bandwidth and value enhancements to offer customers.  Network design and options for providing service are robust, leveraging [its] extensive experience with AAFES.  Resolute consistently presented superior solutions to all factors requested within the RFP.

AR 1520-21.  The Source Selection Committee Report noted that CCS' proposal "scored well" and was "found to be a very viable solution."  AR 1521.  The Report noted that "[CCS was] financially strong, provide[d] a strong product offering, [had] substantial experience," and provided "aggressive monitoring of [the] network."  Id.

The Source Selection Committee Report listed strengths and weaknesses for each offeror compiled from the evaluators' individual comments.  AR 1533-1540.  For Resolute, the overall strengths were:

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * ** * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * ].

AR 1533-34.  For Resolute, the overall weaknesses were:

- [ * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * ].

AR 1533.

For CCS, the overall strengths were:

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * ]
- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * ].

AR 1535-36.  For CCS, the overall weaknesses were:

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ]

- [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ].

Id.

**The Fee Evaluation**

CCS and Resolute proposed the following prices and fee commissions for internet services:

<div align="center">CCS' Fee Proposal[6]</div>

Group      Price for Type of Internet Service

|          | Pre-paid hourly | Pre-paid daily | Pre-paid weekly | Pre-paid monthly (optional) |
|----------|-----------------|----------------|-----------------|------------------------------|
| Alaska   | [ * * * ]       | [ * * * ]      | [ * * * ]       | [ * * * ]                    |
| Eastern  | [ * * * ]       | [ * * * ]      | [ * * * ]       | [ * * * ]                    |
| Central  | [ * * * ]       | [ * * * ]      | [ * * * ]       | [ * * * ]                    |
| Western  | [ * * * ]       | [ * * * ]      | [ * * * ]       | [ * * * ]                    |
| Hawaii   | [ * * * ]       | [ * * * ]      | [ * * * ]       | [ * * * ]                    |

AR 714 (Tab 13).

<div align="center">Resolute's Fee Proposal[7]</div>

Group      Price for Type of Internet Service

|          | Pre-paid hourly | Pre-paid daily | Pre-paid weekly | Pre-paid monthly |
|----------|-----------------|----------------|-----------------|------------------|
| Alaska   | [ * * * ]       | [ * * * ]      | [ * * * ]       | [ * * * ]        |
| Eastern  | [ * * * ]       | [ * * * ]      | [ * * * ]       | [ * * * ]        |
| Central  | [ * * * ]       | [ * * * ]      | [ * * * ]       | [ * * * ]        |

---

- [6] CCS proposed a [ * * * ] fee to AAFES for four regions.  AR 843-49 (Tab 13).

- [7] Resolute proposed an [ * * * ] fee to AAFES for all regions.  AR 687.

| Western | [***] | [***] | [***] | [***] |
| Hawaii | [***] | [***] | [***] | [***] |

AR 583 (Tab 14).  [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ].  AR 687, 709.1 (Tab 14).

The contracting officer, with assistance from AAFES financial technical expert, Otis Wright, prepared the Fee Evaluation Report.  AR 1512; see 107, 1500.  The projected benefit from CCS' and Resolute's price proposals was calculated using the following equation:

Base Population x Price x Fee x Penetration Rate = Projected Income to AAFES

AR 1512.  While this equation was not shared with offerors, the solicitation included the base population for each mandatory military base.  AR 410-16; see First Jackson Decl. ¶ 97.  The total base population for all groups except Alaska was 365,822.  AR 410-16.  Including Alaska, the total base population was 390,274.  Id.

The penetration rate represented the estimated percentage of the base population that would pay for hourly, daily, weekly, and monthly internet service plans.  AR 5876, 5879.  AAFES' independent consultant, Deloitte LLP, calculated standard penetration rates for these services based on FMWRC's historical usage rates in the Continental United States.  Id.  The rates used were 1.8% for pre-paid hourly service, 1.1% for pre-paid daily service, 0.8% for pre-paid weekly service, and 2.9% for pre-paid monthly service.  AR 5879.  AAFES' stated purpose in using these penetration rates was to create a "level playing field," as these rates were uniformly applied to all proposals.  AR 5880.

For contract years one through five, CCS and Resolute were evaluated as follows:

Resolute:     [ * * * * * * * ] estimated total income to AAFES
              (or [ * * * * * * * * ] per year)

CCS:          [ * * * * * * * ] estimated total income to AAFES
              (or [ * * * * * * * * ] per year)

AR 1517.  With Alaska factored out to create an even comparison, Resolute would have provided to AAFES an estimated [ * * * * * * * * ]   for contract years one through five, or [ * * * * * * ] annually.  Id.

Overall, the contracting officer found that Resolute offered the "[m]ost attractive Internet fee proposal for all regions."  AR 1514.  Resolute provided the highest fee percentage per region for all contract years, as well as the highest projected income to AAFES per region for the full 10-year period.  Id.  CCS' fee proposal was ranked [ * * * * * * * * * ] for all regions excluding Alaska.  Id.  Assuming performance for the entire 10-year period and weighting the first five years twice as heavily as the last five, the contracting officer determined that CCS would provide [ * * * * * * * ] in fees to AAFES, whereas Resolute would provide [ * * * * * * * ] in fees to AAFES factoring out Alaska.  AR 1513.

**The Source Selection Decision**

On October 7, 2010, the Source Selection Authority made the source selection decision, based on his assessment of the Source Selection Committee Report, the contracting officer's fee analysis, the contracting officer's recommendation, the solicitation evaluation factors, and a comparative analysis of the proposals' strengths and weaknesses.  AR 1550-55.  The Source Selection Authority determined that Resolute offered the "best overall value for AAFES across all regions . . . ."  AR 1555.  The award determination was contingent upon the contracting officer's pending responsibility determination.  AR 1555.  The Source Selection Authority acknowledged a concern over Resolute's indebtedness to AAFES, but noted that Resolute was making monthly payments to cure deficiencies.  AR 1552.  As of February 17, 2010, Resolute owed AAFES [ * * * * * ] in outstanding fee payments and late charges for sales from October to December 2009.  AR 10529.  The source selection decision contained no further information regarding the debt, but the debt was discussed in Resolute's responsibility determination.  AR 1755, 1757-58.

**The Financial Analysis of CCS and Resolute**

AAFES conducted a financial evaluation of the offerors in late June 2010.  AR Index 2.  Mr. Otis Wright, the Source Selection Committee's financial technical expert, conducted the analysis.[8]  AR 1754-56; <u>see</u> AR 1500, 1512, 8469-89.  Mr. Wright prepared CCS' evaluation using "unaudited statements," because CCS only provided AAFES with the financial information [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ].  <u>Id.</u>  Mr. Wright noted however that [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ].  <u>Id.</u>

Mr. Wright evaluated Resolute to be [ * * * * * * * * * * * * * * * * * * * * * * * * * * ].  AR 1015.  He noted that as of April 2010, a cash flow analysis [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ].  AR 1015-16.  Mr. Wright raised a concern about Resolute's continued viability and its ability to "manage its operating activities through its current financial challenges."  AR 1015.  Yet, Mr. Wright observed that Resolute had a "[ * * * * * * * ] for continued support from its banking partners."  <u>Id.</u>

As part of the responsibility evaluation, the contracting officer submitted a Request for Vendor Financial Data/Clearance to initiate financial reviews of Resolute and CCS.  AR 5497-500, 8504-05.  Based on the results, Resolute was cleared for [ * * * * ] annually and CCS, for [ * * * * * * ] annually, not the full $44.8 million contract amount.  AR 8504-05, 5499-500.

---

[8] Mr. Wright is described as a financial technical expert and an advisor to the Source Selection Committee.  AR 1500, 1519, 1754; Def.'s Mot. J. AR 15, 53, Aug. 8, 2011; Intervenor's Statement of Facts 25, Aug. 8, 2011; Def.'s Supp. Br. 10-11, Apr. 16, 2012.  Mr. Wright holds the title of Financial Analyst III in the office of AAFES Advanced Telecommunications Initiatives.  AR 8489.

In performing the responsibility determination, the contracting officer confirmed that as of August 2010, Resolute maintained an account with [ * * * * * * ] with an average balance of [ * * * * * * * * * * * ] and that the bank considered Resolute's rating [ * * * * * * * ].  AR 8535.  The contracting officer also confirmed that Resolute maintained an account with Bank of America with an average balance of [ * * * * * * * * ].  AR 8536.

During the responsibility determination, which was performed from May to early November 2010, AAFES was aware that Resolute would owe [ * * * * * * * * * * * * * * * * * * * * * * * * * * ] as of June 2010 under a long-term [ * * * * ] debt obligation.  AR 1015, 1755.  The contracting officer received a letter dated August 11, 2010, from [ * * * * * ] clarifying the status of this loan:

> This letter is in response to Resolute Partners, LLC's . . . request . . . [ * * * * * * * * ] for its reply to you regarding the [[ * * * * ] loan] status.  [Resolute] [ * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ] and became effective March 2, 2010 which expired August 1, 2010.  The restructure of the company's debt is subject to the results of the various contracts including the RFP currently under your review.
>
> * * *
>
> It is [ * * * * * * ] intent to support these initiatives and those to come as the relationship between AAFES and Resolute Partners continues to flourish.

AR 8539.

In mid-September, as part of the ongoing financial analysis, the contracting officer contacted [ * * * * * * ] to gain additional information regarding the status of the debt and Resolute's financial future with [ * * * * * ].  AR 8540-41.  The bank responded:

> Resolute is already stable and is performing per its agreed loan terms with [ * * * * * * ].  A long-term structure will be finalized in a maximum of 60 days, subject to the final details received on its various existing contracts and several other outstanding RFP awards that are anticipated very soon.  Resolute's loan balances are in [ * * * * * * * * * * ] . . . .
>
> * * *
>
> [ * * * * * ] will continue to support Resolute and feels very comfortable with Resolute's ability to perform on their various contracts.  In fact, their performance will only be enhanced with the awarding of this RFP.

AR 8540 (emphasis omitted).

Mr. Wright recommended that AAFES proceed with an award to Resolute based on several factors.  AR 1220.  First, he found Resolute would see an increase in sales due to the

award of the contract.  Id.  He noted that in 2009, Resolute had [ * * * * * ] in sales, considering the sales from Resolute's current locations and projected sales from locations in Resolute's offer. AR 1220, 1223.  He estimated sales for each year of the initial five-year contract period as [ * * * * * * ] for 2011, [ * * * * * * ] for 2012, [ * * * * * * ] for 2013, [ * * * * * * ] for 2014, and [ * * * * * * ] for 2015.  AR 1223.  Mr. Wright's forecast indicated that once Resolute began full operation under the contract, its net income would increase by [ * * * ] between 2011 and 2012, and estimated that Resolute could be debt free by 2014.  AR 1220.

Second, Mr. Wright remarked that AAFES' fee commission payments could be booked as "Cost of Sales," such that the payment would be paid against revenue before other operating expenses were paid.  Id.

Third, Mr. Wright considered Resolute's "Book Value," and calculated that an award to Resolute would improve its net present value from [ * * * * * * ] in 2010, to [ * * * * * * ] through 2015, because of its ability to generate sales and net income.  AR 1221.  Mr. Wright found that the rate of return from Resolute's operation under the contract would exceed its cost of capital, thereby increasing its net present value, and that Resolute's strengthened financial position would attract additional capital.  Id.

Fourth, Mr. Wright considered that Resolute would "need [ * * * * * * * ] over the first two years of the contract period for continuing operations and contract execution," and that it was likely that [ * * * * * * ] would "provide as much funding as needed to execute the contract requirements," given the bank's vested interest in Resolute's continued success.  AR 1221-22. Mr. Wright noted that Resolute had previously raised [ * * * * * * ] and estimated that by 2014, funds internally generated would be [ * * * * * ], exceeding the projected funding needs.  AR 1222.

## The Responsibility Determination

On November 8, 2010, the contracting officer completed her Determination of Responsibility.  AR 1753-59.  The Federal Acquisition Regulation ("FAR") does not apply to AAFES.  AR 381.  According to governing AAFES policy, Exchange Service Purchasing Policies (ESR Policy) 65-1, a responsible prospective contractor must meet seven minimum standards.  AR 8020 (ESR Policy 65-1 ¶ 4-46(c)).  At issue in this case are two standards -- that a prospective contractor must (1) have adequate financial resources, or the ability to obtain such resources, as required during performance, and (2) have a record of satisfactory performance "or be able to document beyond reasonable doubt that any prior problems that created a marginal or unsatisfactory situation have been eliminated."  Id.[9]

---

[9] These AAFES standards are similar to FAR requirements.  The first standard parallels FAR 9.104-1(a) (requiring that the offeror "[h]ave adequate financial resources to perform the contract, or the ability to obtain them") and the second is similar to 9.104-1(c) (requiring that the offeror "[h]ave a satisfactory performance record").

**Financial Resources**

In analyzing the adequacy of Resolute's financial resources, "or [the] ability to obtain such resources, as required during performance of the contract," the contracting officer noted in her Determination of Responsibility:

1.      A clear history;
2.      Secured financing;
3.      No serious red flags of financial risk of non-payment; and
4.      [Dun & Bradstreet] payment performance history:
  a. 12-Month [Dun & Bradstreet] PAYDEX Score averages 70 which mean payment to suppliers average 15 days beyond terms;
  b. [3-Month Dun & Bradstreet] PAYDEX Score averages 76 which mean payments to suppliers average 6 days beyond terms; and
  c. A credit appraisal rating of ["3=Fair."]  These ratings indicate timely payments that average 15 days beyond terms.

AR 1754-55.

With respect to bank references, the contracting officer found that Resolute's overall bank and credit rating were considered satisfactory.  AR 1755.  **[** * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * **]**.  <u>Id.</u>

With respect to Resolute's financial projections, the contracting officer, relying on Mr. Wright's analysis, determined that Resolute had suffered declining revenues in 2010, but that the award of this contract would significantly improve Resolute's financial outlook.  AR 1754-56.  The contracting officer accepted Mr. Wright's Book Value analysis and his finding that the integration of revenue from the contract award would allow Resolute to achieve a net present value of **[** * * * * * * **]** based on projections through the 2015 calendar year.  AR 1756.

**Past Performance**

As part of Resolute's responsibility determination, the contracting officer identified two past performance issues with Resolute's 2005 contract with AAFES to provide internet café and other internet access at various locations in Kuwait, Germany, and the Continental United States.  AR 1757.  The first was a warning letter from AAFES for a service disruption dated October 16, 2009, at a European military base.  AR 1757, 8497-98.  The contracting officer stated:  "The issue was resolved in a timely manner by the contractor and service was restored the same day."  AR 1757.  The second issue was "a cure demand," issued by AAFES on January 13, 2010, for the nonpayment of $199,740 in fees under the 2005 contract.  AR 1757-58.  The contracting

officer found that Resolute was taking corrective action to cure this debt. AR 1758. AAFES and Resolute entered into a debt repayment plan for 12 monthly payments of **[ * * * ]** effective June 1, 2010, so that by the time of the responsibility determination on November 8, 2010, the outstanding debt had been reduced from $**[ * * * ]** to $**[ * * * ]**. Id. In spite of this debt to AAFES, Resolute's 2005 contract had been extended for an additional year for all Continental United States locations, and for three years for all locations outside the Continental United States. Id. The contracting officer stated, "To date, [Resolute] continues to provide satisfactory performance and submit payments by the required due date." Id. Ultimately, on November 8, 2010, the contracting officer determined that Resolute was responsible and the Source Selection Authority concurred with this determination. AR 1759.

**The Notice of Award and Debriefing**

On November 9, 2010, AAFES notified CCS of the award to Resolute, and conducted CCS' oral debriefing on December 1, 2010. AR 1760; see AR 1762. During the debriefing, AAFES indicated that FMWRC had been represented on the Source Selection Committee and that its "personnel [had] participated with AAFES in developing the requirements for this Best-Value effort," and that while ARMP was not represented on the Source Selection Committee, "ARMP personnel [had] participated with AAFES in developing the requirements for this Best-Value effort." AR 1774. AAFES also notified CCS that the pro forma Operating Statements were used as part of the financial analysis to assist in the technical and fee evaluations. AR 1775.

## Discussion

**Jurisdiction and Standing**

This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a) which empowers the Court "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States. . . ." The Act continues: "For the purposes of this paragraph, an express or implied contract with the Army and Air Force Exchange Service . . . shall be considered an express or implied contract with the United States." 28 U.S.C. § 1491(a) (2006). "This jurisdictional grant extends to suits brought by disappointed bidders . . . challenging the proposed award of contracts based on alleged improprieties in the procurement process." Cent. Ark. Maint., Inc. v. United States, 68 F.3d 1338, 1341 (Fed. Cir. 1995) (citing CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1572-73 (Fed. Cir. 1983)). "Jurisdiction in these cases arises from an alleged breach of 'an implied contract to have the involved bids fairly and honestly considered.'" Id. (quoting United States v. John C. Grimberg, Co., 702 F.2d 1362, 1367 (Fed. Cir. 1983) (en banc)). The government breaches this implied contract if its consideration of offers is found to be arbitrary, capricious, or otherwise not in accordance with law. Id.

In 1996, Congress enacted the Administrative Dispute Resolution Act ("ADRA"), which provides for judicial resolution of all bid protests in a single court, the Court of Federal Claims, under the standard of review enunciated in the Administrative Procedure Act ("APA"). Pub. L.

No. 104-320, 110 Stat. 3870 (codified as amended at 28 U.S.C. § 1491(b) (2000)).  Under these APA standards, the Court shall:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B) contrary to constitutional right, power, privilege, or immunity;
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> (D) without observance of procedure required by law;

> * * *

> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2006).

ADRA grants this Court exclusive jurisdiction over any "action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2006) (emphasis added).  Because AAFES, the entity that conducted this procurement, is not a federal agency, jurisdiction is not granted under § 1491(b).  However, the Tucker Act bestows jurisdiction over any claim founded upon any implied-in-fact contract with AAFES; ADRA did not diminish the jurisdictional grant in § 1491(a).  Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1245-46 (Fed. Cir. 2010) (holding that implied-in-fact contract jurisdiction under 28 U.S.C. § 1491(a)(1) remains viable for protests where 28 U.S.C. § 1491(b)(1) does not provide a remedy); see also L-3 Commc'ns Integrated Sys., L.P. v. United States, 94 Fed. Cl. 394, 396-97 (2010); FAS Support Servs., LLC v. United States, 93 Fed. Cl. 687, 694 (2010).

CCS has standing as a disappointed bidder because it submitted a proposal.

**Is a Protest Under § 1491(1)(a) Properly Resolved Under Motions for Judgment on the AR or Motions for Summary Judgment?**

As a threshold matter, the parties disagree on the procedural mechanism for resolving this § 1491(a) protest.  Plaintiff filed a motion for summary judgment, while Defendant and Intervenor filed motions for Judgment on the Administrative Record.[10]  CCS points out that no

---

[10] Defendant and Intervenor also filed motions to dismiss claiming that CCS lacked the financial ability to perform the contract and thus lacked standing as an interested party.  The record indicates that CCS has standing.  See AR 1521 (Source Selection Committee Report

rule requires that all bid protests, including those brought under 28 U.S.C. § 1491(a), be resolved on motions for judgment on the AR.  Pl.'s Supplemental Br. 3.  Defendant and Resolute contend that the case is appropriately resolved via motions for judgment on the administrative record because bid protests brought under Section 1491(a) -- while predicated on breach of the implied duty of fair dealing -- are not a different species of protest than those brought under § 1491(b) and therefore should not require a different process.  The Federal Circuit has not yet addressed this procedural issue. See Creation Upgrades, Inc. v. United States, 417 F. App'x 957, 959 (Fed. Cir. 2011) ("Since our decision in Resource Conservation, we have not decided whether bid protest cases brought under § 1491(a)(1) of the Tucker Act are to be decided on the administrative record, and we see no need to decide that question in this case.").

Plaintiff's chosen procedure, summary judgment, is a "short cut" to resolving a case by eliminating the need for fact-finding and trial.  In ruling on summary judgment motions, the Court does not make findings of fact.  Rather, the Court assesses whether any material facts are genuinely in dispute and, if they are not, resolves solely questions of law.  If there are genuine issues of material fact, the Court must deny motions for summary judgment, and the parties proceed to trial.

In contrast, under the regime of motions for judgment on the AR, governed by Rule 52.1, the Court makes findings of fact based upon the administrative record.  As the Federal Circuit explained in Bannum, Inc. v. United States, the trial court must make factual findings "from the record evidence as if it were conducting a trial on the record."  404 F.3d 1355, 1357 (Fed. Cir. 2005).  Then, the Court must determine if the agency's conduct violated the law.  Id.  In adding Rule 52.1 in 2006, this Court expressly acknowledged that "[s]ummary judgment standards are not pertinent to judicial review upon an administrative record."  RCFC 52.1, Rules Committee Notes, 2006 Adoption (citing Bannum, 404 F.3d at 1355-57).

Despite the different procedural mechanisms, the standard of review for resolving bid protests is substantially the same whether the protest is brought under § 1491(a) as a breach of an implied contract or as a traditional bid protest under § 1491(b).  In § 1491(a) protests, the Court reviews whether the agency's conduct was arbitrary and capricious.  See Keco Indus., Inc. v. United States, 192 Ct. Cl. 773, 783-84 (1970) ("[A]rbitrary and capricious action on the part of the Government . . . clearly is a violation of the rule laid down in [Heyer Products Co. v. United States, 135 Ct. Cl. 63 (1956)] that bids should be fairly and honestly considered."); Wetsel-Oviatt Lumber Co. v. United States, 40 Fed. Cl. 557, 565 (1998) ("An invitation for bids . . . carries an implied contractual obligation to fairly and honestly consider all responsive bids.  The government breaches this implied contract if its consideration of the bids is found to be arbitrary,

---

finding CCS' proposal "to be a very viable solution" and identifying CCS as financially strong, with a strong product offering, substantial experience, and aggressive monitoring of the network); Ala. Aircraft Indust., Inc.-Birmingham v. United States, 83 Fed. Cl. 666, 685 (2008) (stating that "DCAA's audit report, combined with payments of Alabama Aircraft expects to earn on the KC–135 PDM contract, strongly support the conclusion that if awarded the contract, Alabama Aircraft would have sufficient financial resources . . . ."), rev'd on other grounds, 586 F.3d 1372 (Fed. Cir. 2009).

capricious, without rational basis, or an abuse of discretion." (citations omitted)); see also Prineville Sawmill Co. v. United States, 859 F.2d 905, 909 (Fed. Cir. 1988); Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1132 (Fed. Cir. 1988); Keco Indus., Inc. v. United States, 203 Ct. Cl. 566, 574 (1974)); L-3 Commc'ns, 94 Fed. Cl. at 397 n.3; FAS Support Servs., 93 Fed. Cl. at 694.  Under 28 U.S.C. § 1491(b)(4), the Court employs the standards set forth in the APA, 5 U.S.C. § 706, which requires the Court to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

In the instant case, a determination of whether the agency's conduct was arbitrary and capricious can be readily made utilizing the AR.  Defendant has filed an ample administrative record, and Plaintiff has invoked that record, seeking to add declarations from its executive vice president and consultant.  In short, all parties rely on facts in the AR in support of their requests for judgment with very limited supplementation.  As such, the Court treats Plaintiff's motion for summary judgment as a motion for judgment on the AR.

**The Scope of the Record and Defendant's Motion to Strike**

CCS seeks to support its protest with five declarations, three from Timothy Evard, Executive Vice President of CCS, and two from Jimmy J. Jackson, a consultant, and the Government moves to strike all these declarations.  In resolving cross-motions for judgment on the AR, the Court must assess whether CCS has justified its request to supplement the AR. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1378-80 (Fed. Cir. 2009).

### Mr. Evard's Declarations

Mr. Evard's first declaration, filed with CCS' complaint, addresses:  (1) CCS' past performance in providing information services, (2) the content of the RFP, (3) the content of CCS' proposal, and (4) the substance of meetings not otherwise described in the record.  Evard Decl. 1-8, Dec. 22, 2010.  CCS filed the second Evard Declaration in response to the Government's argument that CCS waived its claims that AAFES violated 10 U.S.C. § 2492(a) and that ARMP's and FMWRC's involvement in this procurement created improper conflicts of interest.  In this second declaration, Mr. Evard described CCS' understanding of ARMP's role and network build-out plans at the time it submitted its proposal.  Evard Decl. 1-8, Aug. 22, 2011 ("Second Evard Decl.").

Mr. Evard filed a third declaration in response to a Court order asking the parties whether the Implementing Instructions were available to offerors prior to June 18, 2010, where that information was made available, and whether CCS had knowledge of this information.[11]  Mr. Evard answered that this information was not available before June 18, 2010, that he was not aware when or where it was made available, and that CCS did not have knowledge of this information before June 18, 2010.

---

[11]  In its response, Defendant stated that the Implementing Instructions were available to offerors prior to June 18, 2010, the information was made available online at a FMWRC web address, and that CCS either knew or should have known the information.

To resolve the waiver issue, the Court must consider what CCS knew regarding ARMP's role and when CCS learned it -- matters not in the AR.  As such, the Court supplements the record with the third Evard declaration.  Further, the Court supplements the record with information on CCS' knowledge of ARMP's role in the procurement as reflected in Paragraphs 12 and 13 of Mr. Evard's first declaration (discussing CCS' bridge contract and communications with ARMP and AAFES concerning ARMP's future role) and Paragraphs 1 through 11 of Mr. Evard's second declaration (discussing CCS' interpretation of the RFP, information presented at Industry Day, and communications with ARMP and AAFES concerning ARMP's future role).  The remainder of these two declarations either restates information in the solicitation and in Resolute's and CCS' proposals or contains Mr. Evard's personal opinion of Resolute's proposal.  Mr. Evard's opinion of Resolute's proposal is not relevant, and his restatement of material in the record is unnecessary and duplicative.  See Arcow Corp. of Am. v. United States, 96 Fed. Cl. 270, 280 (2010) (excluding portions of a declaration because it merely detailed information already contained in the record); cf. East West, Inc. v. United States, 100 Fed. Cl. 53, 57 (2011) (excluding declaration that provided "information concerning the reaction of plaintiff to certain agency communications").

### Mr. Jackson's Declarations

Mr. Jackson is a consultant CCS retained to review AAFES' responsibility determination.[12]  In his first declaration, filed with CCS' motion for summary judgment, Mr. Jackson addresses the finance-related aspects of Mr. Wright's reviews and the contracting officer's and the Source Selection Committee's decisions.  His second declaration, filed in support of CCS' response to the Government's motion for judgment on the AR, addresses Resolute's financial responsibility and AAFES' calculation of the technical scores.

Mr. Jackson opines that:

- Resolute did not have adequate financial resources and that "the contracting officer should have concluded that Resolute was not financially responsible." Jackson Decl. ¶¶ 9, 10, July 18, 2011 ("First Jackson Decl."); Jackson Decl. ¶¶ 9-11, Aug. 22, 2011 ("Second Jackson Decl.");

- the assumptions in Mr. Wright's financial models overstated Resolute's ability to obtain financing, omitted interest-related expenses, inflated Resolute's sales and revenues, and understated expenses, leading to an erroneous conclusion about Resolute's financial outlook.  First Jackson Decl. ¶¶ 41-67; and

---

[12] Mr. Jackson has evaluated financial and cost analyses in more than 185 bid protests and has been accepted as an expert by the Court of Federal Claims and Federal District Courts. First Jackson Decl. ¶¶ 4(d), 4(g).  He has two masters degrees, one in Business Administration from Southern Illinois University and one in Science in Management from the Massachusetts Institute of Technology's Sloan School of Management.  Id. at ¶ 3(b)-(c).

- the revenue comparison that the Source Selection Committee relied upon improperly used a normalized penetration rate not disclosed to offerors instead of evaluating the projected financial benefits associated with each offer.  Id. at ¶¶ 90-99.

Mr. Jackson also analyzes the scoring of the technical evaluation and conducts his own comparative analysis of portions of CCS' and Resolute's proposals, assigning different subfactor scores.  Second Jackson Decl. ¶¶ 3-4.  In addition, Mr. Jackson questions the comparison of Resolute's and CCS' proposals claiming AAFES failed to consider that CCS did not include Alaska in its proposal, and performs his own analysis acknowledging this circumstance.  Id. at ¶¶ 9-11.  Finally, Mr. Jackson critiques the contracting officer's past performance evaluation because the agency only used a three-point scale -- Strong, Modest, and Weak -- "without having a fourth possible score for Unacceptable," a technique that in his view "masked the high risk of Resolute's financial performance."  First Jackson Decl. ¶¶ 85, 86.

As the United States Court of Appeals for the Federal Circuit recognized in Axiom Resource Management, Inc. v. United States, the parties' ability to supplement the AR in a bid protest is limited, and the "focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review . . . ."  564 F.3d at 1379-81.  It is appropriate to supplement the AR when "technical aspects of the procurement process [would] remain unexplained" without supplementation or "when necessary for the Court to understand technical or complex information involved in the challenged procurement."  Guzar Mirbachakot Transp. v. United States, 104 Fed. Cl. 53, 63-64 (2012) (citations omitted) (supplementing the record with expert testimony regarding electronic file compression and transmission utilities); Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 52, 67 (2010) (finding declarations necessary to illuminate the difference between audit-supporting financial management system services and mission and administrative support IT services); see also Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147, 158 (1997) (permitting supplementation to enable the Court to understand technical solicitation language regarding minimum production rates for shoal dredging).

Consistent with these decisions, an expert in this case could have properly explained complex financial principles and offered an opinion on their impact and application.  There is a fine line though between an expert offering technical analysis -- an acceptable addition to the record -- and an expert substituting his subjective judgment for that of the Government in areas not dependent upon complex technical matters.  In the instant case, Mr. Jackson crossed that line.

Mr. Jackson proffers his opinion on Resolute's responsibility predicated on his subjective evaluation of the record, not on any inscrutable technical matters.  See First Jackson Decl. ¶ 12 (stating it was "irrational" for the contracting officer to find Resolute financially responsible when it was "cleared for less than[ * * ] percent of the contract amount"); ¶ 17 (claiming the contracting officer should have found Resolute's Dun & Bradstreet Report to have been based on outdated information); ¶ 25 (opining that Resolute's financial statements support only an unfavorable financial responsibility determination); ¶¶ 26-40 (questioning the contracting officer's interpretation of letters and communications from [ * * * * * ], and speculating that Resolute was in "default" on its loan); ¶ 72 (stating that Mr. Wright's financial model provides

no "rational basis" for a favorable responsibility determination).  Mr. Jackson's opinion does not provide technical clarification necessary for effective judicial review.  Cf. Allied Tech. Grp., Inc. v. United States, 92 Fed. Cl. 226, 231 (2010) (refusing to consider proffered declarations because the AR was not too complex for the Court to review).

Similarly, Mr. Jackson's critique of AAFES' evaluations are inappropriate supplementation.  See First Jackson Decl. ¶ 85 (stating that AAFES' evaluation criteria for risk scoring should have included an "unacceptable" score); see also Second Jackson Decl. ¶¶ 9-12 (presenting how Mr. Jackson would have calculated the AAFES fee percentages).  Expert opinions that purport to assess an agency's procurement decisions are not proper supplementation of the AR.  In PlanetSpace Inc. v. United States, the Court rejected declarations proffered by the plaintiff because they essentially "attack[ed] the merits of [the agency's] award decision."  90 Fed. Cl. 1, 6 (2009).  Although the PlanetSpace plaintiff claimed that the declarations there were a technical aid to explain the pricing differences among proposals, the Court found that the declarations re-argued the merits of the parties' financing plans and amounted to a "comparative assessment of the strengths and weaknesses of the proposals . . . ." Id. at 8.  So too, Mr. Jackson questions the correctness of the contracting officer's and Source Selection Committee's conclusions.  Whether or not the contracting officer and Source Selection Committee and Source Selection Authority made "reasonable" decisions on these procurement matters is a determination for this Court and is not a proper subject for expert opinion.  Id.

In Al Ghanim Combined Group Company General Trading & Contracting W.L.L. v. United States, the Court excluded two declarations by Mr. Jackson in a bid protest.  56 Fed. Cl. 502, 504 (2003).  In challenging the pricing evaluation, Mr. Jackson opined that the agency had failed to perform a "price realism analysis" that would have revealed that the awardee's pricing was unrealistic.  Id. at 511.  The Court excluded Mr. Jackson's declarations because they did not "fill a gap in the record" or provide necessary clarification, stating:

> Even if characterized as expert testimony, Mr. Jackson's opinions do not aid the court in its analysis of plaintiff's arguments.  Admissible expert testimony, as governed by [FRE] 702, must assist the trier of fact to understand the evidence or to determine a fact in issue.  Plaintiff's arguments are devoid of complexities that might require expert assistance, and plaintiff's counsel is able to explain its arguments fully without the need of expert testimony.

Id. at 512 (citations and quotation marks omitted).  Here, as in Al Ghanim, because Mr. Jackson re-argues the merits of the Government's award decision, his declarations are unnecessary for a full and complete understanding of the issues in the protest.

## Waiver Under *Blue & Gold* in § 1491(a)(1) Protests

Defendant and Intervenor, relying on Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1315 (Fed. Cir. 2007), seek dismissal of Counts I and II on the ground that CCS knew the basis for these claims prior to the conclusion of the bidding process, but did not raise them until after award.  In Count I, CCS claims that Defendant violated 10 U.S.C. § 2492a by allowing ARMP to either (i) compete for a contract to provide Personal Information Services directly to

fee-paying users, or (ii) itself provide Personal Information Services directly to fee-paying users. In Count II, CCS claims that ARMP's role as a subcontractor and FMWRC's participation on the Source Selection Committee and its involvement, along with ARMP's, in shaping the solicitation, constituted organizational conflicts of interest.

### Is the *Blue & Gold* Waiver Doctrine Limited to § 1491(b) Protests?

In Blue & Gold, the Federal Circuit held "that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." Id. at 1313.  CCS argues that as a matter of law, the Blue & Gold waiver doctrine only applies to bid protests brought under 28 U.S.C. § 1491(b), not to protests invoking § 1491(a) jurisdiction, emphasizing the following language in Blue & Gold:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims.
>
> * * *
>
> Having recognized a waiver rule in § 1491(b) bid protest actions, we must decide whether the Court of Federal Claims erred in applying it to this case.

Id. at 1315 (emphasis added).

While Blue & Gold itself concerned a § 1491(b) bid protest, there is nothing in the decision that limits the waiver rule to bid protests predicated on § 1491(b) jurisdiction.  What drives the waiver rule is the pragmatic recognition that a bidder must object to the terms of a patently erroneous solicitation while the Government can still remedy the situation.  Id. at 1314-15.  The patent ambiguity doctrine as articulated in Blue & Gold is equally applicable in any bid protest whether brought under § 1491(a) or (b).  As the Federal Circuit explained:

> [The patent ambiguity] doctrine "was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact."  These reasons . . . apply with equal force in the bid protest context.  In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal.  If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors.

Id. at 1313-1314 (quoting Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1580 (Fed. Cir. 1993)).

There is no reason to disavow the Blue & Gold waiver rule merely because jurisdiction is predicated on this Court's general breach-of-contract jurisdiction instead of its more specific bid protest jurisdiction. To hold otherwise would permit bidders in § 1491(a) protests to do exactly what the Blue & Gold Court prohibited -- to roll the dice and wait to protest if they do not win. As the Federal Circuit explained:

> It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.

Id. at 1314 (alteration in original) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)).

The Federal Circuit recently reemphasized that the Blue & Gold waiver rule should be broadly applied in bid protests in COMINT Systems Corporation v. United States, 700 F.3d 1377 (Fed. Cir. 2012). There, the Court held that the plaintiff waived its right to challenge an amendment to the solicitation by not protesting before contract award, even though the amendment was issued after the close of the bidding process. The Federal Circuit expanded Blue & Gold by applying its reasoning "to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." COMINT, 700 F.3d at 1382. As such, the Federal Circuit extended the time a protestor may file a pre-award protest from the "close of the bidding process" as articulated in Blue & Gold to any time before award is made. See also Bannum, Inc. v. United States, 115 Fed. Cl. 257, 274 (2014). The Federal Circuit recognized that "[t]he same policy underlying Blue & Gold supports it extension to all pre-award situations." COMINT, 700 F.3d at 1382.

CCS contends that the Blue & Gold waiver rule should not apply in § 1491(a) protests because the implied-in-fact contract giving rise to jurisdiction is not formed unless an offeror submits a proposal, the very act which causes the waiver under Blue & Gold. Thus, CCS posits that a plaintiff challenging a solicitation under § 1491(a) would have the Hobson's choice of either filing a protest prior to submitting a proposal, thus bypassing the requirement for establishing § 1491(a) jurisdiction, or waiving its ability to protest by submitting a proposal. Such a narrow and draconian view of the § 1491(a) bid protest process is unwarranted.

CCS' perceived dilemma was apparently spawned by an overly broad reading of Motorola, Inc. v. United States, 988 F.2d 113 (Fed. Cir. 1993). CCS misconstrues Motorola to establish a general principle that submission of a proposal is always required to establish the implied-in-fact contract necessary for § 1491(a) pre-award protest jurisdiction. While the trial court in Motorola did articulate that principle, the Federal Circuit, using limiting language in its affirmance, did not adopt the trial court's reasoning wholesale. The plaintiff in Motorola filed

33

suit challenging a solicitation as being unduly restrictive and precluding it from submitting a bid. The <u>Motorola</u> plaintiff based its assertion of implied contract jurisdiction on the Government's requests for, and Motorola's submission of, information to assist the Government in developing the solicitation.  <u>Id.</u> at 114-15.  In dismissing Motorola's complaint for failure to state a claim, the trial court concluded that "[s]ince there was no bid here, there was no promise; hence, no basis for finding the existence of a pre-award contract upon which a claim for injunctive relief can be based." <u>Id.</u> at 116.[13]

    In affirming <u>Motorola</u>, while agreeing that no implied contract arose because plaintiff had not submitted a bid, the Federal Circuit added important qualifiers, stating that Motorola had "not <u>otherwise</u> met its burden to show that an implied in fact contract existed," and that "[o]rdinarily a bid is required to establish that a pre-award implied in fact contract exists." <u>Id.</u> at 114 (emphasis added) (citation omitted).  This language underscores the appellate court's recognition that the submission of a bid is not the <u>sine qua non</u> for establishing an implied-in-fact contract and acknowledges alternatives for "otherwise" establishing the implied-in-fact contract necessary for pre-award protest jurisdiction.  Further, the Federal Circuit expressly limited its endorsement of the <u>Motorola</u> trial court's opinion "to the extent consistent with the above" reasoning.  <u>Id.</u>

    The Federal Circuit's refusal in <u>Motorola</u> to restrict the manner in which an implied-in-fact contract can be formed in the pre-award procurement process setting is consistent with fundamental principles of contract formation.  As the Restatement (Second) of Contracts § 24 teaches, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  The Government's manifestation of a willingness to enter a bargain and a vendor's assent to that bargain need not be exclusively expressed via a formal bid or proposal in the pre-award context.

    But even if CCS were correct that it had to submit a proposal in order to form an implied-in-fact contract giving rise to this Court's jurisdiction, it could still have preserved its rights.  CCS could have protested the terms of the solicitation and in the alternative, timely submitted a proposal that purported to respond to the allegedly flawed solicitation.  In sum, CCS' effort to insulate § 1491(a) protests from the <u>Blue & Gold</u> waiver rule fails.

---

    [13]    In so holding, the <u>Motorola</u> trial court departed from the holdings in <u>Standard Manufacturing Company v. United States</u>, 7 Cl. Ct. 54 (1984) and <u>Magnavox Electronics Systems Company v. United States</u>, 26 Cl. Ct. 1373 (1992).  In <u>Standard Manufacturing</u>, the court held that a contractor's response to government requests for information created an implied contract that all responses would be fairly and honestly considered, satisfying the jurisdictional prerequisite for a pre-award bid protest under Section 1491(a).  7 Cl. Ct. at 58-60.  Similarly, in <u>Magnavox</u>, notices of intent to conduct a sole-source procurement published in the Commerce Business Daily coupled with a contractor's response that it could perform the work, resulted in an implied contract to give the contractor's response honest and fair consideration.  26 Cl. Ct. at 1377-78.

**CCS Knew Its Grounds of Protest Prior to Award**

As explained above, parties who have the opportunity to object to the terms of a solicitation containing patent errors or ambiguities and fail to do in a timely fashion waive their ability to subsequently raise the same objections. COMINT, 700 F.3d at 1382; Blue & Gold, 492 F.3d at 1316; Bannum, 115 Fed. Cl. at 273-74.

**CCS Waived Its Claim of a Statutory Violation**

In Count I, CCS claims that the Government violated 10 U.S.C. § 2492a, which provides:
(a) Limitation.—(1) Notwithstanding section 2492 of this title, the Secretary of Defense may not authorize a Department of Defense entity to offer or provide personal information services directly to users using Department resources, personnel, or equipment, or compete for contracts to provide such personal information services directly to users, if users will be charged a fee for the personal information services to recover the cost incurred to provide the services or to earn a profit.

(2) The limitation in paragraph (1) shall not be construed to prohibit or preclude the use of Department resources, personnel, or equipment to administer or facilitate personal information services contracts with private contractors.

10 U.S.C. § 2492a.

CCS alleges that ARMP was either competing for a contract to provide Personal Information Services or providing these services directly to fee-paying users in violation of § 2492a, by acting as a subcontractor and continuing to build out its own network. However, by waiting to file its protest until after award, CCS waived this ground of protest. The solicitation clearly informed offerors that ARMP could be a subcontractor and lease its infrastructure to offerors reiterating identical communications conveyed to offerors in the draft solicitation and the Industry Day presentation. In CCS' case, there was also a pre-solicitation exchange with AAFES clarifying ARMP's role.

The draft solicitation expressly informed prospective offerors that ARMP could be utilized as a subcontractor for "locations where ARMP [had] installed infrastructure," and that offerors would have the "option of leasing the ARMP network and equipment . . . ." AR 119-20. Further, the draft solicitation listed several advantages of utilizing ARMP's network.

A few weeks later, the Industry Day briefing made clear that an offeror had the option to use ARMP's infrastructure in certain locations and to designate ARMP as its subcontractor. See AR 275-76. Industry Day attendees, including CCS representatives, were informed that ARMP would provide a variety of services, including "Internet Gateway & LAN Services" and "Internet Access Device leasing." AR 275. Industry Day attendees also learned that ARMP would

provide these services in the Continental United States at "[m]ost major garrisons" with "[p]lans to reach all garrisons in coming years."  AR 276.[14]

Just a few days after Industry Day, on May 3, 2010, CCS sent AAFES an email requesting clarification of ARMP's role, stating:

> Subject: RFP comments
> The ARMP role is a little confusing and the scope of [its] support is not clear. Will [it] only be able to provide support services where [it has] deployed [Personal Information Services] already? Will [it] be able to provide those services where [it deploys FMWRC Information Services] going forward (over [its FMWRC Information Services] network)?  Is there any certainty around where and on what time schedule [it] will be able to provide services going forward?

AR 2943.  The contracting officer responded, stating:

> a)  ARMP is not limited to deploy [Personal Information Services] to provide support.  The deployment of ARMP's official service support network [FMWRC network] is independent from the for fee services that AAFES will offer.

> b) ARMP would need to confirm [its] capability outside the Army sphere and [FMWRC] network.  As the [FMWRC] network expands, the capability to support providers will also expand; although, separate agreements and [Service-Level Agreements] are required with ARMP to consider future expansion.

Id.

CCS claims that this exchange did not advise it that ARMP could be used for future build-outs, and that the contracting officer's answer was "vague" and "border[ed] on evasive." Pl.'s Reply & Opp'n 36-37, Aug. 22, 2011.  According to CCS, it was not clear that ARMP's support included providing infrastructure.  Id. at 37.  CCS' interpretation is untenable.  CCS asked:  "Will [ARMP] only be able to provide support services where [it has] deployed [Personal Information Services] already?"  AR 2943 (emphasis added).  The contracting officer said no, stating "ARMP is not limited to deploy [Personal Information Services] to provide support," and added that ARMP's expanding FMWRC Information Services network could be utilized via separate agreements.  Id.

A few weeks after this clarification, the Government issued the solicitation, listing the benefits of using ARMP as a subcontractor, and reiterating ARMP's role and clarifying that the

---

[14]  Mr. Evard, CCS' Executive Vice President, saw the slide "showing that ARMP had an aggressive build-out plan," but assumed that the information on the slide was out of date and reflected ARMP's plans before the December MOA.  Second Evard Decl. ¶ 10.  CCS' erroneous assumption does not change the fact that ARMP's role was disclosed during Industry Day.

ARMP network would continue to expand.  AR 366-67.  In a paragraph titled "ARMP as a Potential Internet Sub-Contractor," the solicitation stated that ARMP could provide both existing and "planned" infrastructure.  AR 366-67.  CCS claims that "planned" referred only to projects for which construction was already under way, but there is no basis in the record for CCS' gloss.

In sum, given the language in the draft and final solicitations, the Industry Day presentation, and CCS' exchange with AAFES, CCS knew that ARMP had been providing and would continue to provide network infrastructure and other support services as a subcontractor to the successful offeror -- the predicate for its claim that the Government violated 10 U.S.C. § 2492a.  Even though it was aware of this alleged defect in the solicitation, CCS did not protest until after it failed to receive the award.  As such, CCS waived its ability to protest this statutory violation under <u>Blue & Gold</u>.

**<u>The Court Declines to Invoke a Statutory Violation Exception to the Waiver Doctrine</u>**

CCS argues that even if it waived its statutory claim, the Court should not apply <u>Blue & Gold</u> because a significant statutory violation is at issue.  Pl.'s Reply & Opp'n 43.  CCS posits that the <u>Blue & Gold</u> waiver rule originated in part from the Government Accountability Office's ("GAO") timeliness rule.  This rule permits GAO to consider an untimely protest "for good cause shown, or where it determines that a protest raises issues significant to the procurement system . . . ."  <u>Id.</u> at 44 (quoting 4 C.F.R. § 21.2(c)).  As CCS  recognizes, GAO's exception to the timeliness rule applies "only where the untimely issue directly concerns the interpretation or application of the procurement statutes or regulations on a matter of widespread interest to the procurement community."  <u>Id.</u> (citing 4 C.F.R. § 21.2(c) and quoting <u>DePaul Hosp. & The Catholic Health Ass'n of the United States</u>, B-227160, 87-2 CPD ¶ 173, 1987 WL 102790, at *4 (Comp. Gen. Aug. 18, 1987) (citations omitted)).

CCS contends that this Court should adopt a similar exception because AAFES violated the statute and contravened the legislative intent of prohibiting Government competition in the commercial marketplace.  <u>Id.</u> at 45.  Even assuming arguendo that CCS is correct that AAFES violated 10 U.S.C. § 2492a in this procurement, applying a statutory violation exception to the <u>Blue & Gold</u> waiver rule would not be appropriate.  The <u>Blue & Gold</u> waiver rule as extended by <u>COMINT</u> is simple:  if there is a patent ambiguity or error in the solicitation, a plaintiff must seek redress in court prior to award.  In fashioning and reaffirming this judicial waiver rule, the Federal Circuit did not adopt GAO's rule or practice, it applied a judicial doctrine, the patent ambiguity doctrine, and recognized that it was unfair and inefficient to allow protestors to game the system by waiting to raise problems with a solicitation until after they failed to receive the award.  As such, this Court declines CCS' invitation to carve out an exception to the <u>Blue & Gold</u> waiver rule.

Even if the Court were to invoke GAO's rule, GAO's exception to waiver would not apply here.  As GAO has noted, "In order to prevent the timeliness rules from becoming meaningless, the significant issue exception is strictly construed and seldom used," and the burden is on the untimely protestor to show that its protest is of "widespread interest to the procurement community."  <u>DePaul Hosp.</u>, 1987 WL 102790, at *4.  Statutory violations of widespread interest typically implicate broad procurement statutes.  See <u>Adrian Supply Co.-</u>

37

<u>Reconsideration</u>, 66 Comp. Gen. 367, 368-69 (1987) (applying the exception to the timeliness rule because of a failure to properly evaluate sealed bids in violation of the Competition in Contracting Act); <u>Ass'n of Soil and Found. Eng.</u>, B-199548, 80-2 CPD ¶ 196, 1980 WL 15985, at *2 (Comp. Gen. Sept. 15, 1980) (applying the exception to the timeliness rule to a protest involving the Brooks Act), <u>rev'd on other grounds</u>, B-199548.2, 82-2 CPD ¶ 128, 1982 WL 31895 (Comp. Gen. Aug. 13, 1982).

Here, section 2492a is narrow.  It only applies to a very limited category of procurements within DoD -- NAFI contracts for "Personal Information Services" offered to users for a fee. CCS has not persuaded the Court that an alleged violation of this narrow statute would have sufficient widespread interest in the procurement community to vitiate a well-entrenched waiver rule.  <u>See</u> <u>HMX, Inc.</u>, B-291102, 2003 CPD ¶ 52, 2002 WL 32072769 at *5 n.8 (Comp. Gen. Nov. 4, 2002) (rejecting protestor's claim that the applicability of the Commercial Space Act of 1998, Pub. L. 105-303, 112 Stat. 2843 (repealed 2010) involved an issue of "widespread interest in the procurement community" justifying an exception to the timeliness rule); <u>Goel Servs., Inc.</u>, B-310822.2, 2008 CPD ¶ 99, 2008 WL 2185937, at *2 (Comp. Gen. May 23, 2008) (finding that a protest alleging an incorrect price evaluation for HUBZone firms under FAR 19.1308 was not "of widespread interest to the procurement community warranting its resolution in the context of an otherwise untimely protest").

### CCS' Waiver of Its Organizational Conflict of Interest Claim

In Count II, CCS claims that ARMP's role as a subcontractor and FMWRC's employees' participation on the Source Selection Committee and involvement in shaping the solicitation constituted an improper organizational conflict of interest in violation of AAFES' regulations.[15] CCS' OCI argument centers on AAFES' Exchange Service Purchasing Policies 65-1, which governs all AAFES purchases.  Paragraph 1-21 of this policy states:

> Selection of contractors and award of contracts must be made free of any conflict of interest.  A conflict of interest exists when the person selecting items for purchase, selecting a contractor, placing an order or awarding a contract has a financial interest in the business of the firm receiving an order or contract, or is in a position to benefit because of a family interest.  Contracting officers, their representatives, ordering agents and other AAFES personnel who are authorized to determine requirements, select items, or sign, approve, disapprove or administer contracts (including inspection), are required to disqualify themselves from contract transactions involving an actual or potential conflict of interest.

AR 7980.

CCS posits that two FMWRC employees, David LaPradd and John Temple, who were on the Source Selection Committee, and a third FMWRC employee, Nate Wills, an Army

_____

[15]  Additionally, CCS claims violations of the FAR and Army Regulation 215-4, but these regulations do not apply to NAFIs.

contracting specialist on the contracting team, had a financial interest in an award to Resolute, because Resolute proposed using ARMP as its primary subcontractor and ARMP is an affiliate of FMWRC.  Specifically, CCS contends:

> ARMP, Resolute's primary subcontractor, is an affiliate (*i.e.*, a subsidiary organization) of their employer, FMWRC.  Thus, at a minimum, these individuals had a "direct or indirect financial interest" or "other beneficial interest" in a "proposed subcontractor" of one of the firms submitting a proposal.  Because they were involved in "selecting items for purchase, selecting a contractor, placing an order or awarding a contract" and, through their employer, had a "financial interest in the business of the firm receiving" award, these individuals had an impermissible conflict of interest.

Pl.'s Mem. in Support of Mot. Summ. J. ("Pl.'s  Mem.") 17, July 21, 2011 (internal citation omitted).

The Government argues that CCS waived this OCI claim because FMWRC's involvement was known to CCS prior to the deadline for submission of proposals, pointing to slides from the Industry Day presentation.  Resolute likewise argues that CCS waived this claim because FMWRC/ARMP personnel attended the conference and identified themselves as employees of FMWRC and ARMP, and attendees, including at least four CCS employees, saw a slide entitled "Key Procurement/Operations Team" identifying three individuals from FMWRC and one from ARMP as team members.  Intervenor's Mem. in Support of Cross Mot. J. 15; see AR 279-80, 328-29.[16]

CCS contends that the Industry Day materials did not provide it with sufficient notice of ARMP's and FMWRC's role because the slide did not indicate whether Messrs. LaPradd, Temple, and Wills would be on the procurement or operations side.  Pl.'s Reply & Opp'n 38.  CCS' post-hoc interpretation of this slide is not persuasive.  Even if the slide did not detail the precise involvement of the FMWRC employees in the procurement, it put CCS on notice that they would be "key" players, triggering a duty to inquire.  As Intervenor argues, "[t]o the extent [ARMP's and FMWRC's role] was unclear, CCS was obligated to seek clarification of the issue and protest if there was any ambiguity."  Intervenor's Reply 6.  On several occasions, CCS sought clarification or voiced complaints about other aspects of the procurement, and AAFES regularly responded to these inquiries.  Even though it was on notice of these individuals' "key" roles in the procurement, CCS did not raise its OCI complaint until after it was denied the award.  Therefore, CCS waived its ability to protest on these grounds under Blue & Gold.

## CCS' Organizational Conflict of Interest Claim Fails

Even if CCS had not waived its OCI claim, this claim is unfounded.  CCS' OCI claim is predicated on AAFES' procurement policy, which provides:  "A conflict of interest exists when

---

[16] Neither Defendant nor Intervenor argue that CCS had notice of these employees' roles in the procurement by virtue of the Implementing Instructions.

the person selecting items for purchase, selecting a contractor, placing an order or awarding a contract has a financial interest in the business of the firm receiving an order or contract . . ." AR 7980.   AAFES enforced this aspect of its procurement policy by requiring the Source Selection Committee members to complete and submit a Conflict of Interest Statement.   AR 8139.  The form stated:

> To the best of my knowledge and belief, no conflict of interest exists that may diminish my capacity to perform an impartial and objective review of the offeror's proposal, or may otherwise result in a biased opinion or an unfair advantage.  . . . In determining whether any potential conflict of interest exists, I agree to review whether my or my employer's relationships with other persons or entities, including but not limited to, ownership of stocks, bonds, other outstanding financial interests or commitments, employment arrangements (past, present, or under consideration) . . . may place me in a position of conflict, real or apparent, with the evaluation proceedings.

AR 8142.  Each member was required to complete the form and return it to the contracting officer.  AR 8139.

However, Messrs. LaPradd, Temple, and Wills submitted a different form, entitled Certificate for Personnel Participating in Source Selection Concerning Nondisclosure, Conflicts of Interest, and Rules of Conduct.  AR 8152 (Mr. LaPradd), 8154 (Mr. Temple), 8157 (Mr. Wills).  That form contained the following statement regarding conflicts of interest:

> To the best of my knowledge, I certify that neither I nor my spouse . . . have any direct or indirect financial interest in any of the firms submitting proposals, or their proposed subcontractors or have any other beneficial interest in such firm except as fully disclosed on an attachment to this certification.

Id. (¶ 2).  None of these three employees disclosed a beneficial interest on an attachment.  Id.

Plaintiff claims that "[t]he representations made by Messrs. LaPradd, Temple, and Wills in such forms are demonstrably and unassailably inaccurate," based solely on the fact of their employment at FMWRC, their roles on either the Source Selection Committee or the contracting team, ARMP's status as a potential subcontractor, and FMWRC's relationship with ARMP. Pl.'s Mem. 17-18.

The mere circumstances of these employees' positions and ARMP's role do not establish that the FMWRC personnel in question had a financial interest in Resolute.  CCS' OCI claim is predicated solely on the fact that ARMP is an affiliate of FMWRC, Messrs. LaPradd, Temple, and Wills' employer.   CCS asserts a broad-based speculative contention that these three employees necessarily had a financial interest in ARMP based on this affiliation.  In essence, CCS would divine a prohibited financial interest on the part of these FMWRC employees "in the business of" ARMP and attribute that interest to Resolute.  Nothing in the record suggests that ARMP's performance under Resolute's contract could have impacted the compensation of Messrs. LaPradd, Temple, and Wills.  CCS also ignores the fact that in its own proposal, it

planned to use ARMP, thus creating the same conflict of interest it alleges. Specifically, CCS' proposal stated: "CCS has plans and the necessary partnerships, including ARMP, in place to roll services out to all locations . . . ." AR 713 (Tab 13). Of the 74 mandatory bases CCS proposed to service with internet, CCS proposed using ARMP as its "deployment partner" at 18 locations, and using ARMP infrastructure where available. AR 804, 830-34 (Tab 13).

In this procurement, contractors were offering to provide Personal Information Services directly to service members. AAFES was to obtain a commission, but there was no showing that such commission would inure to the benefit of FMWRC personnel. To demonstrate an organizational conflict of interest, a protestor must identify "hard facts" -- a mere inference or suspicion of a conflict is not enough. PAI Corp. v. United States, 614 F.3d 1347, 1352-54 (Fed. Cir. 2010) (finding that no organizational conflict of interest existed because the plaintiff failed to identify "hard facts"); see also JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 659 (2002), aff'd, 56 F. App'x 474 (Fed. Cir. 2003); L-3 Servs., Inc., B-400134.11, 2009 CPD ¶ 171, 2009 WL 2883179, at *11 (Comp. Gen. Sept. 3, 2009) (finding no impaired objectivity when the relationship between the firms was attenuated and the possibility of financial benefit was too remote); Am. Mgmt. Sys., Inc., B-285645, 2000 CPD ¶ 163, 2000 WL 1507307, at *4-5 (Comp. Gen. Sept. 8, 2000) (finding no organizational conflict of interest when the agency's integration contractor provided assistance in procuring software and the integration contractor and a software vendor had an agreement to seek out joint opportunities because the potential benefit was too speculative and remote); Prof. Gunsmithing Inc., B-279048, 1998 WL 526375, at *3 (Comp. Gen. Aug. 24, 1998) (finding alleged conflict of interest too speculative based on consultant evaluator receiving royalty payments if a certain design were selected).

Nor has CCS demonstrated the requisite prejudice to establish an OCI claim. As the Court stated in JWK International Corporation v. United States, "[i]n short, even assuming the existence of a conflict, plaintiff has not shown that 'had it not been for the alleged error in the procurement process, there was a reasonable likelihood that [it] would have been awarded the contract.'" 52 Fed. Cl. at 658 (second alteration in original) (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (stating that to "prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." (citation and quotation marks omitted)). Similarly, CCS has not shown that there was a reasonable likelihood it would have received the award if Messrs. LaPradd and Temple were not part of the evaluation team and Mr. Wills was not part of the contracting team. CCS has not claimed that the two FMWRC personnel on the Source Selection Committee evaluated CCS or Resolute differently than the other three voting Committee members. In fact, Resolute's score would have been higher than CCS' score even if the evaluations of Messrs. LaPradd and Temple were removed from the mix. As such, CCS' claim that an organizational conflict of interest existed in this procurement under AAFES' procurement policies fails.

## AAFES' Evaluation of Proposals

CCS claims that AAFES incorrectly evaluated the proposals by failing to use the proposal scoring template and by normalizing the penetration rates.

**Scoring**

CCS claims that AAFES' numeric scoring of the offerors' proposals did not reflect the actual strengths and weaknesses assigned by the Source Selection Committee. Specifically, CCS argues that the majority of the individual evaluators failed to use the "proposal scoring template" which provided the following comment codes: SS = significant strength, S = strength, SW = significant weakness, W = weakness, C = clarification, and R = risk. E.g., AR 1253, 10508. Only one evaluator used the recommended comment codes, while the other evaluators either used a plus, minus, and neutral system, or simply provided comments. E.g., AR 1308-13, 1369-74, 1486-91 (using the required codes); AR 1248-1253, 1349-1354 (using mix of plus/minus and written comments).

CCS argues that the evaluators' plus/minus system did not distinguish between strengths and significant strengths or weaknesses and significant weaknesses, or identify risks. Given the subjective assessments required, CCS fails to appreciate the discretion afforded technical evaluators in scoring the technical elements in this procurement and overemphasizes the role of the proposal scoring template. Neither the solicitation nor AAFES' Exchange Operating Procedure 65-13 required the use of comment codes for Significant Strengths, Strengths, Weaknesses, Significant Weaknesses, and Risks. According to the solicitation, evaluators were to numerically score proposals for each of the 11 evaluation factors, and justify the final ratings "by drawing upon the strengths, weaknesses, and risks identified." AR 453-54. The individual evaluation sheets reflect that the evaluators complied with this requirement. Each team member wrote notes articulating what aspects of each proposal warranted a given score. See, e.g., AR 1271 (noting that CCS has 10 years in the internet business and experience working on a military base, as justification for a past performance score of **[ * * * ]** out of 100); AR 1389 (noting that Resolute allows WiFi subscribers to print to Resolute printers and that gaming devices may be associated with user accounts, as justification for a products score of **[ * * * ]** out of 100). The failure to regurgitate the comment codes listed on the individual evaluator worksheets is a matter of form, not substance, and does not warrant invalidating the technical evaluation. As the Federal Circuit has recognized, challenges to the technical scoring involve the "minutiae of the procurement process," "discretionary determinations of procurement officials that a court will not second guess." COMINT, 700 F.3d at 1384 (quotation marks omitted) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (citations omitted)).

CCS further argues that there is a disconnect between the Source Selection Committee's recommendation, the point scores assigned for each factor, and the strengths and weaknesses listed in the attachment to the Committee's Report. CCS submits that the ratings in the Report were not justified by "'drawing upon the strengths, weaknesses, and risk[s] identified'" as required by the solicitation. See Pl.'s Mem. 40-43. These "disconnects" are summarized as follows:

| **The Solicitation Factor** | **The Final Weighted Average Scores** | **The Alleged Flaw** |
|---|---|---|
| Technical Design | CCS: **[ * * * ]**  Resolute: **[ * * * ]** | **[ * * *   * * * * * * * * * * * *   * * * * * * * * * * * * * *   * * * * * * * * * * * * * *** |

| The Solicitation Factor | The Final Weighted Average Scores | The Alleged Flaw |
|---|---|---|
| | | * * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * ]. |
| Scalability | CCS: [ * * * ]<br><br>Resolute: [ * * * ] | [ * * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * ]. |
| Standards | CCS: [ * * * ]<br><br>Resolute: [ * * * ] | [ * * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * ]. |
| Portability | CCS: [ * * * ]<br><br>Resolute: [ * * * ] | [ * * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * ]. |
| Past Performance | CCS: [ * * * ]<br><br>Resolute: [ * * * ] | [ * * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * ]. |
| Speed to Market | CCS: [ * * * ]<br><br>Resolute: [ * * * ] | [ * * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * * *<br>* * * * * * * * * * * * ].[17] |

---

[17] Resolute presented its analysis in a different format than CCS.  While CCS presented a full critical path graph for each installation, Resolute chose to group the installations into categories, then provide a critical path for each category.  Compare AR 804-26 (Tab 14) with AR 535-41 (Tab 13).

CCS argues that the strengths and weaknesses identified in the Source Selection Committee Report are "completely at odds" with the numeric scores.  AR 1520.  In so arguing, CCS disregards the results of the Committee's consensus evaluation of each proposal, which assigned Resolute more strengths and fewer weaknesses overall than CCS.  Compare AR 7825-26, 7828-30 (Resolute's strength/weakness determinations) with 7835-7839 (CCS' strength/weakness determinations).  For example, under the Technical Design factor, one of the two most important evaluation factors, CCS received [ * * * ] weaknesses and [ * * * ] strengths as compared to Resolute's [ * * * ] weakness and [ * * * ] strengths, a finding that reasonably supports to the higher score Resolute received.  AR 7825, 7838.  The same is true for the other "disconnects" CCS alleged, with the difference in scores reflecting the strength/weakness determinations:

- Scalability:  Resolute had [ * * ] strengths and [ * ] weaknesses compared to CCS' [ * * ] strengths and [ * * ] weakness.  AR 7828, 7836;

- Standards:  Resolute had [ * * ] strengths and [ * ] weaknesses compared to CCS' [ * * ] strengths and [ * * ] weaknesses.  AR 7828, 7836;

- Portability:  Resolute had [ * * ] strengths and [ * ] weaknesses compared to CCS' [ * * ] strengths and [ * * ] weaknesses.  AR 7826, 7835;

- Past Performance:  Resolute had [ * * ] strengths and [ * * ] weaknesses compared to CCS' [ * * ] strengths and [ * * ] weaknesses.  AR 7829, 7837; and

- Speed to Market:  Resolute had [ * * ] strengths and [ * * ] weakness compared to CCS' [ * * ] strengths.  AR 7826, 7835.

This was a best value procurement, and the technical evaluators were charged with assessing which proposal's overall features, including technical design, products, portability, speed to market, customer service, and business understanding, best met the Government's needs.  As the Federal Circuit has recognized, "agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.'"  Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993) (quoting Tidewater Mgmt. Servs., Inc. v. United States, 216 Ct. Cl. 69, 83 (1978)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 911 (Fed. Cir. 2013) (citing E.W. Bliss, 77 F.3d at 449 (citations omitted)) (holding that a court will not second guess the discretionary determinations of procurement officials regarding the minutiae of the procurement process including technical ratings); COMINT, 700 F.3d at 1384 (same); Galen, 369 F.3d at 1330 (citing E.W. Bliss, 77 F.3d at 449) (stating that the contracting officer has even greater discretion when a contract is to be awarded on "best value" than on the basis of cost alone).

CCS further alleges that the Source Selection Committee violated AAFES procurement policies by using flawed ratings and failing to justify the numeric scores given to CCS and Resolute.  The record does not support this allegation.  Rather, the record reflects that each voting member of the Source Selection Committee independently evaluated and scored each evaluation factor for each proposal and wrote comments explaining or justifying the member's independent determination.  AR 1248-1499.  For example, for the Products evaluation factor,

one member gave CCS a score of **[ \* ]**, with comments that CCS could "rollout by June 2011 as requested," had "multiple 'architectures' of systems used to serve different bases/environments," and could provide internet in public hotspots.  AR 1248.  A different Committee member gave CCS a score of **[ \* ]** for the Products evaluation factor, noting that CCS "complies with all requirements," that it was "[c]urrently providing internet service through DSL equipment," that it had "[g]ood experience in [the] military environment, but seems to offer only one method, either DSL or Cable modem," and that it had "[l]imited offerings dependent on partnership."  AR 1328.  While the individualized ratings spanned a wide range, this does not mean they were flawed or erroneous.  Instead, this circumstance highlights the subjectivity of the evaluation process and the reality that different aspects of CCS' offer were valued by the individual raters.  "This Court does not sit as a super source selection authority to second guess and re-score offerors' proposals."  AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 367, opinion clarified by, 87 Fed. Cl. 654 (2009); Ne. Military Sales, Inc. v. United States, 100 Fed. Cl. 103, 110 (2011) ("[T]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." (citation and quotation marks omitted)).  CCS has not demonstrated that the ratings were flawed, or the numeric scores unwarranted.  See COMINT, 700 F.3d at 1384.

CCS also contends that the Source Selection Committee's consensus scores were inadequately justified.  Once the individual evaluations were completed, Source Selection Committee members met to determine their consensus scores and modified their individual scores as a result of the discussion.  See AR 7492 (EOP 65-13 ¶ 4-23).  The modifications were either made directly on score sheets or were reflected as differences between the numerical scores on individual score sheets and the final Source Selection Committee Proposal Scoring Spreadsheet, which reflected the consensus numbers.  E.g., AR 1270-73 (noting changes in specific factor scores "after discussion"); AR 1328-33 (highlighting several large point increases for CCS from its original score).

Below is a summary of the changes between the initial individual scores and the Source Selection Committee's Proposal Scoring Spreadsheet for Resolute's and CCS' proposals for internet services:

### Individual Source Selection Committee Member Scores for CCS[18]

| Evaluation Factor | Individual Scores Pre Consensus Meeting | | | | | Individual Scores Post Consensus Meeting | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | JT | DL | AM | MK | MV | JT | DL | AM | MK | MV |
| Products | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Portability | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Marketing | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Technical Design | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Scalability | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

---

[18] This comparison is derived from scores on individual score sheets in AR 1248-1432 and on the Source Selection Committee's Proposal Scoring spreadsheet in AR 1228 and 1230.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Standards | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Speed to Market | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Account Service | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Care and Customer Satisfaction | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Past Performance | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Business Understanding and Reporting | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

AR 1228, 1248-53, 1268-73, 1290-95, 1308-13, 1328-33.

### Individual Source Selection Committee Member Scores for Resolute

| Evaluation Factor | Individual Scores Pre Consensus Meeting | | | | | Individual Scores Post Consensus Meeting | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | JT | DL | AM | MK | MV | JT | DL | AM | MK | MV |
| Products | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Portability | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Marketing | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Technical Design | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Scalability | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Standards | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Speed to Market | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Account Service | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Customer Care and Customer Satisfaction | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Past Performance | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |
| Business Understanding | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] | [***] |

AR 1230, 1349-54, 1369-74, 1389-94, 1407-12, 1427-32.

These tables show that as a result of Source Selection Committee discussions, individual Committee members reconsidered and at times altered their original scores. The modified individual scores were then converted into weighted scores for each factor by each individual evaluator. AR 1228, 1230. The average of each individual evaluator's modified weighted score was then used as a final score for ranking the proposals. AR 1228, 1230, 1525, 1552-54.

CCS does not argue that the comments and explanations accompanying these scores were inaccurate. Rather, CCS contends that, because not every comment or explanation of a strength and weakness was quoted in the Source Selection Committee Report, the scores were somehow flawed. However, the evaluators' comments indicate that they weighed the merits of each

proposal and considered all aspects of the proposals in arriving at their scores and rankings. There is no reason for this Court to second guess the scoring here.  "[I]t is well established that the Court should not substitute its judgment to assess the relative merits of competing proposals in a government procurement."  AshBritt, 87 Fed. Cl. at 367 (citing R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).

CCS also claims that the record does not support AAFES' representation that it called each offeror's past performance reference, but this allegation is belied by the AR.  AR 1520, 7840.  The Source Selection Committee Report states that "[r]eferences for each offeror were contacted and used in evaluations.  The reference calls were incorporated into the past performance factor and scored accordingly.  No information was received from the reference calls that resulted in any scoring impact."  AR 1520.  The record reflects that each voting member of the Source Selection Committee made reference calls and documented the information from each call.  See AR 1266-67, 1286-87, 1326-27, 1346-47 (reflecting eight reference calls about CCS and noting customers' feedback, e.g., customer was "very pleased with [CCS'] performance," CCS had "great customer support" and was "on target [with] everything"); 1367-68, 1387-88, 1425-26, 1445-46 (reflecting eight reference calls about Resolute and noting customers' feedback, e.g., customers were "very pleased with [Resolute's] performance" and "happy [with Resolute] on service and response to problems," and Resolute had a "well dedicated model" and was "very responsive to all customer needs").

Lastly, CCS claims that the Source Selection Authority adopted the "flawed ratings" without discussing the significance of the technical differences in terms of contract performance or governmental needs.  According to CCS, the Source Selection Decision highlighted the same scores, strengths, and weaknesses identified by the Source Selection Committee without "digging deeper and analyzing the significance of the scores."  Pl.'s Mem. 45.  However, CCS has not shown that the underlying technical evaluations were incorrect, irrational, or inadequately documented, or that the findings here warranted "digging deeper."  Indeed, CCS ignores the fact that the Source Selection Committee found Resolute to be the hands down choice in the technical and past performance factors.  The Committee's Report stated:

> With the exception of the corporate financial position, this is clearly the best proposal.
>
> . . . Resolute has strong, flexible product options with ample bandwidth and value enhancements to offer customers.  Network design and options for providing service are robust, leveraging [its] extensive experience with AAFES.  Resolute consistently presented superior solutions to all factors requested within the RFP.

AR 1520-21.

## AAFES' Fee Evaluations

CCS claims that AAFES' evaluation of price proposals was arbitrary and capricious because AAFES improperly "normalized" the offerors' price proposals in two respects:  (1) it used a "normalized penetration rate" -- the estimated percentage of the base population that would pay for internet service -- based solely on ARMP's subscription information, and (2) it

used a "normalized base revenue figure." CCS contends that the normalized penetration rate was improper because the solicitation allowed offerors to choose their technical approaches and did not force them to use ARMP. CCS claims the agency's use of a normalized base revenue figure was unnecessary because offerors submitted pro forma Operating Statements and cost projections as required by the RFP. CCS further contends that because these normalized protocols were not disclosed in the solicitation CCS was prejudiced.

The purpose of normalization is to measure offers against the same "baseline." As this Court has recognized, it is appropriate to use normalization techniques in procurements when there is no logical basis for differences in approach or when there is insufficient information available to accurately evaluate proposals. Computer Scis. Corp. v. United States, 51 Fed. Cl. 297, 316 (2002) (citation omitted). Normalization allows the agency to establish a common "should have bid" estimate. Id. (citation omitted). It segregates "cost factors which are 'company unique' . . . from those which are generally applicable to all offerors . . . ." Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 510 (2005) (quotation marks omitted) (quoting Computer Scis., 51 Fed. Cl. at 316 (citation omitted)). In order to overturn an agency's normalization decision, the protestor must demonstrate that the choice made by the agency was irrational. Marquette Med. Sys., Inc., B-277827.5, B-277827.7, 99-1 CPD ¶ 90, 1999 WL 311686, at *5 (Comp. Gen. Apr. 29, 1999).

To calculate the projected financial benefit of offers, AAFES used the following formula:

Projected Income = Base Population x Price x Fee Percentage x Penetration Rate

AAFES' independent consultant, Deloitte, calculated standard penetration rates for these services based on FMWRC's historical usage rates in the Continental United States. AR 5876, 5879. The rates used were 1.8% for pre-paid hourly service, 1.1% for pre-paid daily service, 0.8% for pre-paid weekly service, and 2.9% for pre-paid monthly service. AR 5879.

In their pro forma Operating Statements, offerors assumed different penetration rates, which translated into different potential revenues. CCS proposed a flat fee of [ * * * ] based on a [ * * * * * * ] penetration rate, while Resolute proposed fees from [ * * * * * ] based on a penetration rate of [ * * * * ]. Neither offeror allowed for different penetration rates depending on whether a customer chose hourly, daily, weekly, or monthly service options, yet AAFES' historical data showed that there were different rates for these services. Because the dollar amount that AAFES would receive in fees was pegged to usage and dependent upon accurate penetration rates, AAFES needed to compensate for either overstatements or understatements of potential usage in order to accurately measure revenues. Normalizing the penetration rate allowed AAFES to accurately measure how CCS' and Resolute's different fee percentages would translate into dollars received by AAFES. Thus, CCS has not shown that AAFES' decision to normalize the penetration rate was unreasonable or prejudicial.

## AAFES' Responsibility Determination of Resolute

According to AAFES policy, a responsible prospective contractor must meet seven minimum standards. See AR 8020 (ESR Policy 65-1 ¶ 4-46). At issue in this case are two standards -- that a prospective contractor must (1) have adequate financial resources, or the

ability to obtain such resources as required during performance, and (2) have a record of satisfactory performance "or be able to document beyond reasonable doubt that any prior problems that created a marginal or unsatisfactory situation have been eliminated." Id. CCS argues that the responsibility determination was arbitrary and capricious because the contracting officer unreasonably concluded that Resolute had adequate financial resources and that its prior performance difficulties had been resolved.

### The Financial Responsibility Determination

CCS claims there is inadequate factual support to conclude that Resolute had sufficient financial resources to perform the contract and that AAFES placed too much emphasis on how the contract award would improve Resolute's financial outlook. "Contracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001) (citing Grimberg, 702 F.2d at 1367); NCL Logistics Co. v. United States, 109 Fed. Cl. 596, 610 (2013); Afghan Am. Army Servs. Corp. v. United States, 106 Fed. Cl. 714, 722 (2012); Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 266 (2011). The Court "cannot substitute [its] judgment for that of the contracting officer in making responsibility determinations." Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002) (upholding a financial responsibility determination because even though the awardee had financial problems, the contracting officer examined the financial data before him and articulated a rational explanation for his decision).

Under AAFES' procurement policy, in order to be financially responsible, a prospective contractor must have "adequate financial resources, or the ability to obtain such resources, as required during the performance of the contract." AR 8020. The contracting officer here considered Resolute's past financial difficulties, but placed more weight on the likelihood of Resolute's improved financial future, which was permissible under AAFES' policy -- requiring that a contractor have the "ability to obtain" adequate financial resources. This is not arbitrary and capricious or irrational action.

A paramount element of CCS' challenge to Resolute's responsibility determination concerns Resolute's [ * * * * * * * * * * * * * * * ]. CCS claims that Resolute was in "default" on this loan, but nothing in the record supports a conclusion that Resolute had defaulted or missed payments on its [ * * * * * * * * * * * * * * * ]. The contracting officer was aware of the loan. AAFES contacted the bank, and the bank provided documentation showing that Resolute was repaying the loan. AR 1755, 8539, 8540-41. Further, the bank [ * * * * * * * * * * * * * * * * * * * * * * ]. Instead of finding Resolute in default, [ * * * * * * ] unequivocally stated that Resolute was a stable business, "performing per its agreed loan terms with [ * * * * * ]," that the bank would continue to support Resolute and was comfortable with Resolute's ability to meet its obligations. AR 8540.

A responsibility determination is a business judgment, and contracting officials enjoy wide discretion in determining whether proceeding to award a contract to a particular entity poses undue risk. NCL Logistics, 109 Fed. Cl. at 623 (citations omitted). Here, the agency made this award fully aware of Resolute's financial challenges and determined Resolute to be

responsible.  See Ettefaq-Meliat-Hai-Afghan Consulting, Inc. v. United States, 106 Fed. Cl. 429, 436 (2012) (citations omitted) ("[T]his type of assessment is a quintessential business judgment, and this Court will not second guess the contracting officer's judgment where there is supporting evidence.").  In Bender Shipbuilding, the Federal Circuit affirmed a financial responsibility determination where the Army awarded a contract to a bidder that had recently filed for bankruptcy under Chapter 11.  297 F.3d at 1362-63.  The contracting officer in Bender Shipbuilding acknowledged the seriousness of the company's financial situation but awarded it the contract, based in part on a guarantee of performance by the offeror's parent company and the availability of progress payments under the contract.  Id. at 1360.  In upholding the decision, the Federal Circuit noted the "wide discretion" that contracting officers have in making responsibility determinations and acknowledged that the awardee and its parent had financial problems, but did not disturb the contracting officer's determination that the awardee was financially responsible.  Id. at 1362.  The awardee in Bender Shipbuilding was in a more precarious position than Resolute here.  There is no indication that Resolute was approaching bankruptcy, and Resolute demonstrated that it had support from [ * * * * * * ].  CCS has not shown that the contracting officer abused her discretion in finding Resolute responsible.

Citing the Vendor Financial Clearance data, CCS argues that since Resolute was not cleared for the full contract amount, or even for [ * ] of the contract amount, it should not have been found financially responsible.  A financial clearance is "an independent source of information for the contracting officer" indicating a "firm's financial capability."  AR 8033.  Financial clearance under AAFES' policy is only required for "merchandise, supplies, and equipment purchases."  Id.  The purpose of AAFES' financial clearance policy is to "make sure the supplier will ship ordered merchandise timely and will reimburse AAFES for returns (QA rejections, recalls, aged merchandise, and so forth)."  Id.  This contract was not for the purchase of "merchandise, supplies, or equipment," but rather involved provision of telecommunication services to users for a fee with a portion of that fee going back to the NAFI.  As such, the financial arrangement here did not pose the type of risk AAFES' financial clearance was intended to address.  In any event, AAFES policy states that the financial clearance process does not, by itself, dictate responsibility.  Id.  The policy allows a contracting officer to find an awardee financially responsible even if it does not receive financial clearance in an amount equivalent to the proposed purchase.  Id.

CCS further challenges AAFES' use of financial statements.  CCS correctly observes that the contracting officer erroneously claimed that Resolute's financial analysis was based on "audited financial statements for 2007, 2008, and 2009."  AR 1755 (emphasis added).  In fact, Resolute submitted audited statements for 2007 and 2008, and unaudited statements for 2009.  While CCS claims the absence of audited statements for 2009 should have "set off alarm bells," its own actions belie this claim.  CCS itself did not submit audited financial statements.  AR 1011.

The remainder of CCS' challenges to the financial responsibility determination rest solely on matters the Court may not address -- declarations that are not in the record containing Mr. Jackson's opinions as to Mr. Wright's financial analysis and the contracting officer's decision.  The record provides no basis for this Court to overturn the contracting officer's responsibility determination.  AAFES and the contracting officer were fully aware of Resolute's financial difficulties.  AAFES' expert, Mr. Wright, acknowledged that Resolute faced severe financial

challenges, but projected that if Resolute received the award of the AAFES contract, Resolute's financial outlook would greatly improve.  AR 1755, 8484.  The contracting officer reasonably relied on Mr. Wright's analysis, noting not only that award would improve Resolute's financial outlook, but that Resolute would be able to "meet commission payment requirements during the contract period of performance."   AR 1756.   As <u>Bender Shipbuilding</u> established, it is permissible for a contracting officer to consider income that a contractor would receive if the contract at issue were awarded. 297 F.3d at 1362-63.

### <u>Consideration of Past Performance in the Responsibility Determination</u>

CCS attempts to find fault with the contracting officer's consideration of Resolute's past performance, arguing that the contracting officer ignored critical information.  The contracting officer identified two main past performance issues for Resolute.  The first was a warning letter dated October 16, 2009, for a service disruption.  AR 1757.  The contracting officer noted that the issue had been resolved in a timely manner and that service had been restored the same day.  The second issue was a demand for the nonpayment of fees issued on January 13, 2010, and CCS claims that the contracting officer ignored a cure notice from February 2010, but this allegation is not supported by the record.  The February 2010 letter discussed the same debt referenced in the January 13, 2010 letter, provided Resolute with an additional 30 days to provide a "more definitive action plan" and was part of the corrective action process referenced in the responsibility determination.  AR 10529; <u>see</u> AR 1757-58.  The contracting officer found that Resolute took sufficient corrective action, including a renegotiation of debt owed to AAFES.  AR 1757-58.  While the contracting officer did not cite the February 2010 letter, this is not a basis to overturn her responsibility determination.  As the contracting officer noted, Resolute began making payments on all debts in July 2010, and had consistently made payments since then.  AR 1758.

### <u>The Alleged Appearance of Impropriety</u>

CCS alleges that the debt Resolute owed AAFES from a prior contract created an appearance of impropriety.   CCS claims that FMWRC's and ARMP's involvement in the procurement, coupled with their and AAFES' interest in Resolute, created an "aura of inevitability" in the outcome of the competition, and skewed the competition in favor of Resolute.  However, CCS has not cited any case where a procurement was overturned on the ground that a debt of an awardee to a government procuring entity created an appearance of impropriety.

CCS contends that there was an appearance of impropriety for several reasons.  First, CCS claims that Resolute's debt gave AAFES an interest in the financial success of Resolute and a reason to favor Resolute in the competition.  However, as the Government points out, Resolute and AAFES had agreed upon a new payment schedule prior to award, and Resolute was current under that schedule.  Further, the record contains no evidence that the debt affected any member of the Source Selection Committee, their scores, or the evaluations of any offerors.

Second, CCS argues that due to AAFES' partnership with FMWRC, AAFES had a vested interest in the outcome of the procurement, FMWRC as ARMP's parent organization

would benefit from the fees Resolute would pay to ARMP for use of ARMP's network, and an award to Resolute would significantly expand ARMP's market share.  However, there is no proof that the relationships of ARMP, AAFES, and FMWRC with Resolute were any different than their relationships with CCS.  Both CCS and Resolute had prior working relationships with ARMP, and like Resolute, CCS planned to use ARMP at bases covered under the contract -- as the solicitation permitted.  AR 830-34.

Third, CCS points to an email from Resolute to an ARMP employee requesting that the employee inform AAFES how well Resolute and ARMP worked together as a team on an earlier project.  The email states:

> AAFES will be evaluating bidders on their technical abilities and speed to market as extremely important criteria.  The fact that ARMP and Resolute working together completed our [transfer of function] responsibilities within 35 days of our actually being told we could proceed.  I believe this shows we make a formidable rapid response team.  Any way you can get this information to them in writing [which] can only help our mutual case[?]  Bill Hart/ARMP was listed as a reference in our reference binder that was submitted 3 weeks ago so there may be a couple ways you could get this scorecard to the right folks.  Indirectly, I hope John Temple and Nate Wills are also aware of our mutual accomplishments.

AR 2195.  According to CCS, this email shows both that Resolute was attempting to use its relationship with ARMP to its advantage in the evaluation and that ARMP had an interest in the procurement.  The Government notes that no employee of ARMP, FMWRC, or AAFES ever responded to the email or agreed to reach out on Resolute's behalf.  Nor is there any evidence that any member of the Source Selection Committee was contacted as a result of this email.  As such, this email does not create an appearance of impropriety.

The Government argues that CCS' appearance of impropriety argument is actually an allegation of bias in favor of Resolute on the part of government officials, and that CCS cannot meet the evidentiary standard to show bias which requires overcoming the presumption of good faith.  In Space Age Engineering, Inc. v. United States, the Court applied the bias standard to an appearance of impropriety claim.  4 Cl. Ct. 739, 743-45 (1984) (finding that inferences and allegations failed to constitute the "clear and convincing proof" required to show impropriety on the part of the government).

CCS disputes that it alleged bad faith or bias, and thus argues it should not be required to meet the standard of "well-nigh irrefragable proof."  Whether one characterizes CCS' claim as bias or an appearance of impropriety, CCS must demonstrate hard facts to prevail.  Turner Constr. Co. v. United States, 645 F.3d 1377, 1387 (Fed. Cir. 2011); see also CACI, 719 F.2d at 1583 (overturning trial court's decision to enjoin contract award based on an appearance of impropriety when the decision was based on "suspicion and innuendo" rather than hard facts); Four Points By Sheraton v. United States, 66 Fed. Cl. 776, 787 (2005) (rejecting plaintiff's allegation of bias based upon alleged inconsistent or erroneous evaluations as vague and without evidentiary support); Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 218 (2011) (finding that alleged access to offices, participation in meetings, and roles in development of databases

were not "hard facts" showing that a contractor obtained specific non-public source selection information about a pricing evaluation). In <u>Dynalectron Corporation v. United States</u>, the Claims Court declined to find an appearance of impropriety because the allegation was based on suspicion and innuendo, stating, "Plaintiff wants relief because of how [the procurement] looked, not because of how it was." 4 Cl. Ct. 424, 430 (1984).

The only evidence proffered by CCS in support of this appearance-of-impropriety claim is the email from Resolute to ARMP requesting that ARMP put in a good word for Resolute due to the good quality and speedy implementation of Resolute's prior work for ARMP. This email is similar to the situation addressed in <u>Galen</u> where the awardee listed a technical evaluator as a past performance reference, and the Federal Circuit held that the evaluator's name on a list of references was insufficient to show that the procurement was tainted. 369 F.3d at 1335-37. Similarly, the fact that Resolute requested an ARMP employee to provide what was essentially a past performance reference does not taint the competition here. As noted above, no employee of ARMP, FMWRC, or AAFES ever responded to the email, and there is no evidence in the record that ARMP contacted any member of the Source Selection Committee as a result of Resolute's email. CCS has failed to present sufficient evidence of an appearance of impropriety that tainted the award.

### <u>Conclusion</u>

1.      The Court **GRANTS IN PART** Defendant's motion to strike the declarations of Timothy Evard and Jimmy J. Jackson. The Court supplements the record with Paragraphs 12 and 13 of Mr. Evard's first declaration, 1 through 11 of Mr. Evard's second declaration, and the entirety of Mr. Evard's third declaration, and strikes the remainder of Mr. Evard's declarations. The Court strikes Mr. Jackson's declarations.

2.      The Court **DENIES** Plaintiff's motion for summary judgment (treated as a motion for judgment on the administrative record).

3.      The Court **GRANTS** Defendant's and Defendant-Intervenor's motions for judgment on the administrative record.

4.      The Clerk is directed to enter judgment accordingly.

<div style="margin-left:40%">

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

</div>